STATE OF NORTH CAROLINA v. JOHN WILLIAMS, JR.

No. 278A99

(Filed 28 June 2002)

**1. Joinder— charges—transactional connection**

The trial court did not abuse its discretion by granting the State's motion under N.C.G.S. § 15A-926(a) to join the charges against defendant including two counts of first-degree murder, two counts of first-degree rape, first-degree sexual offense, assault with a deadly weapon, two counts of assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, assault with a deadly weapon with intent to kill, and first-degree rape even though the charges involved seven different victims over a fifteen-month span, because a transactional connection was established through numerous factors including a similar modus operandi, similar circumstances with respect to the type of victims, similar location, and a DNA match between defendant and several of the victims.

**2. Evidence— possible perpetrators other than defendant— relevancy**

The trial court did not err in a first-degree murder and first-degree rape case by ruling that defendant's evidence implicating three other men as possible perpetrators was inadmissible, because: (1) there was no evidence one of the alleged perpetrators had committed the crime except for his proximity to the crime scene; (2) even though defendant sought to call another of the alleged perpetrators as a witness and then impeach him with another witness's testimony, prior inconsistent statements may not be used as substantive evidence; and (3) the evidence defendant sought to elicit about the last alleged perpetrator did not tend to implicate the man, nor was the evidence inconsistent with defendant's guilt.

**3. Evidence— cross-examination—failure to make offer of proof**

The trial court did not err in a first-degree rape, first-degree sexual offense, and aggravated assault case by sustaining the State's objection to defendant's questions during cross-examination of two of the State's witnesses, because: (1) in

regard to the cross-examination of the police officer witness, defendant failed to make an offer of proof in order to preserve the issue concerning whether the officer had identified an individual who fit the description given to the police by the victim; and (2) in regard to the cross-examination of a witness allegedly interviewed by the police as a suspect in the murder of one of the victims, defendant again failed to make an offer of proof and the mere fact of the witness being interviewed by the police does not raise an issue concerning the credibility or bias of the witness. N.C.G.S. § 8C-1, Rule 103(a)(2).

### 4. Evidence— hearsay—unavailable declarant

The trial court did not err in a first-degree murder case by excluding hearsay testimony of a detective regarding his interview of an unavailable witness who told the detective that he had seen the victim alive the day before the discovery of her body, because: (1) defendant did not establish that the unavailable witness's testimony possessed equivalent guarantees of trustworthiness; (2) the testimony of an eyewitness was more probative than the unavailable witness's hearsay statement regarding the victim being alive; and (3) the trial court specifically concluded that the general purposes of the rules and the interests of justice would not be best served by the admission of the unavailable witness's statement. N.C.G.S. § 8C-1, Rule 804(b)(5).

### 5. Evidence— cross-examination—motion to strike testimony on redirect examination

The trial court did not err in a first-degree murder case by sustaining the State's objections to two questions that defendant asked a detective on cross-examination and by overruling defendant's motion to strike certain testimony that the detective gave on redirect examination, because: (1) the answers by the detective were irrelevant under N.C.G.S. § 8C-1, Rule 401 considering all of the evidence against defendant and the fact that defendant's DNA was found on the victim, and defendant failed to carry his burden to show that there was evidence which tends both to implicate another and to be inconsistent with the guilt of defendant; and (2) defendant failed to carry his burden to show prejudice to any alleged error by the trial court with regard to the question and answer during redirect examination, and any alleged prejudice was rendered moot when the detective testified that other people were included in his investigation.

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

## 6. Evidence— alternative suspect—failure to show evidence

The trial court did not err in a first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by excluding evidence of an alternative suspect, because defendant has not shown that any evidence implicated the other person, nor has defendant shown any evidence that would be inconsistent with defendant's guilt.

## 7. Discovery— prosecutor's investigative files—other suspects

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by denying defendant's written motions for pretrial discovery relating to other suspects and to other offenses with which defendant was not charged, because: (1) no statutory provision or constitutional principle requires the trial court to order the State to make available to a defendant all of its investigative files relating to his case, and defendant has not cited any statute that would give the trial court the authority to grant defendant's motions; (2) defendant is not entitled to the granting of his motion for a fishing expedition; and (3) defendant has not shown any violation of the Due Process Clause when the United States Supreme Court has held that due process does not require the State to make complete disclosure to defendant of all of the investigative work on a case. N.C.G.S. § 15A-904(a).

## 8. Criminal Law-motion to continue— failure to show prejudice

The trial court did not abuse its discretion in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, assault with a deadly weapon with intent to kill, and first-degree rape case involving seven different victims over a fifteen-month span by denying defendant's motion to continue, because defendant has shown no evidence that the lack of additional time prejudiced his case or that he would have been better prepared had the continuance been granted.

**9. Homicide— first-degree murder—short-form indictment—constitutionality**

The use of a short-form indictment to charge a defendant with first-degree murder was constitutional even though it did not set forth the aggravating circumstances upon which defendant's death eligibility was based.

**10. Discovery— pretrial motion—bill of particulars**

The trial court did not abuse its discretion in a prosecution for first-degree murder, first-degree rape, first-degree sexual offense, and other crimes involving seven different victims over a fifteen-month span by denying defendant's pretrial motion under N.C.G.S. § 15A-925(c) for a bill of particulars, because: (1) defendant has not shown that the information requested was necessary to enable defendant to adequately prepare or conduct his defense; (2) all of the information that defendant requested was in the materials he received from the prosecution pursuant to open file discovery; and (3) defendant does not suggest surprise or specify in what manner the denial of his motion affected his trial strategy.

**11. Indigent Defendants— motion for funds to hire expert—change of venue**

The trial court did not abuse its discretion in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by denying defendant's motion for funds in order to hire an expert to prove the necessity for a change of venue based on pretrial publicity, because defendant has not shown any evidence that he was deprived of a fair trial due to the absence of a jury-selection expert or that there was a reasonable likelihood that the expert would have been able to materially assist him in the preparation of his case.

**12. Discovery— criminal records of witnesses and victims—oral request for access to Police Information Network**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a

deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by denying defendant's pretrial motions for disclosure of the criminal records of the witnesses and victims involved in the case against defendant and by denying defendant's oral request for an order allowing his investigator to have access to the Police Information Network from which the criminal records could be obtained, because: (1) no statutory or constitutional principle requires a trial court to order the State to make a general disclosure of criminal records of the State's witnesses; and (2) the prosecution witnesses were cross-examined rigorously and no additional impeaching evidence gleaned from the criminal records of these witnesses would have created a reasonable doubt of defendant's guilt which did not otherwise exist.

13. **Jury— selection—understanding about parole eligibility for a life sentence**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree sexual offense and other crimes involving seven different victims over a fifteen-month span by denying defendant's request to question jurors during jury selection on their understanding about parole eligibility for a life sentence, because defendant has failed to establish any compelling reason why our Supreme Court should reconsider its prior holding deciding this issue against defendant.

14. **Confessions and Incriminating Statements— Miranda warnings—appointment of counsel—reinitiation of contact by defendant—subsequent statement—waiver of counsel**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill involving seven different victims over a fifteen-month span by denying defendant's motion to suppress a statement he gave to the Raleigh Police Department after he was arrested, advised of his Miranda rights, declined to make a statement, and had counsel appointed to represent him where (1) defendant reinitiated contact with the police and stated that he had information for them; (2) defendant was advised of his Miranda rights, he signed a waiver of rights form, and defendant indicated that he understood his rights and wished to waive them; (3) defendant was further advised by the officers

that he was still represented by counsel, and defendant waived his right to have his attorney present; (4) although the trial court denied defendant's motion to suppress the entire statement, it granted defendant's motion to suppress that part of the statement occurring after defendant asserted his right to remain silent; and (5) there is no factual basis in the record for defendant's contention that the statement was obtained in violation of the North Carolina Code of Professional Ethics Rule 7.4(1), which is now embodied in Rule 4.2(a).

**15. Evidence— motion in limine—statement about electric chair—bias—reference to beating—failure to preserve issue**

The trial court did not abuse its discretion in a prosecution for two first-degree murders and other crimes involving seven different victims over a fifteen-month span by denying defendant's pretrial motion in limine to redact that part of his statement from 25 February 1997 which referred to the electric chair, and a reference to defendant allegedly being beaten up by men hired by a girl who knew the defendant, because: (1) the statement involving the electric chair was relevant under N.C.G.S. § 8C-1, Rule 401 in order to show defendant's bias against his former girlfriend whom defendant had accused of participating in one of the murders; and (2) defendant failed to properly preserve his hearsay argument concerning the second statement about the men beating up defendant since defendant did not specify hearsay as a basis for objecting to this part of the statement.

**16. Appeal and Error— preservation of issues—identification of defendant—pretrial motion to suppress—failure to object at trial**

Although a defendant contends the trial court erred in an assault with a deadly weapon with intent to kill and attempted first-degree rape case by denying defendant's pretrial motion to suppress evidence of the show-up identification of defendant by the victim, defendant did not preserve this issue because: (1) defendant failed to object to the testimony introduced at trial pertaining to the show-up identification; and (2) our Supreme Court has held that a pretrial motion to suppress is not sufficient to preserve for appellate review the issue of admissibility of evidence.

**17. Appeal and Error— preservation of issues—identification of defendant—objection lost based on previously admitted evidence**

Although a defendant contends the trial court erred in an attempted first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by failing to suppress the identification of defendant by the victim through a photographic lineup even though the prosecution notified defendant that the victim had seen a photograph of defendant prior to the lineup, defendant did not preserve this issue because: (1) defendant lost the benefit of his objection to a detective's testimony concerning the photographic lineup since defendant failed to object to the same testimony given by the victim; and (2) defendant did not request a ruling on his renewed motion pertaining to the photographic lineup as required by N.C. R. App. P. 10(b)(1).

**18. Identification of Defendants— photographic lineup—in-court identification**

The trial court did not err in a first-degree rape, first-degree sexual offense, and assault with a deadly weapon with intent to kill inflicting serious injury case by denying defendant's motion to suppress a photographic lineup identification and in-court identification by the victim identifying defendant as her attacker, because: (1) defendant failed to refile a more specific motion to suppress after the trial court denied defendant's motion subject to defendant's right to file a more specific motion or motions directed to a particular identification of defendant by a specific victim or other witnesses; and (2) defendant failed to object to the disputed evidence once it was admitted in open court.

**19. Jury— panels—motion to dismiss—alleged disproportionate underrepresentation of defendant's race**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree sexual offense and other crimes involving seven different victims over a fifteen-month span by denying defendant's motions to dismiss jury panels based on defendant's African-American race allegedly being disproportionately underrepresented in the composition of the jury panels, because: (1) a difference of 12.13% is insufficient in and of itself to conclude that the representation of African-Americans in this venire was not fair and reasonable in relation to their population in the community; and (2) defendant failed to present evidence showing that the alleged deficiency of African-Americans on the

jury was based on the systematic exclusion of this group in the jury selection process.

### 20. Jury— selection—peremptory challenges—African-American prospective jurors

The trial court did not violate a defendant's constitutional rights in a prosecution for two first-degree murders and other crimes involving seven different victims by allowing the State to exercise peremptory challenges against two African-American prospective jurors because, taken singly or in combination, the State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during voir dire.

### 21. Jury— capital—opposition to death penalty

The trial court did not err in a capital first-degree murder prosecution by denying defendant's motion to allow jurors who were opposed to the death penalty to sit as jurors in the guilt-innocence phase of the trial, because: (1) N.C.G.S. § 15A-2000(a)(2) provides that the same jury that determines the guilt of a defendant should recommend the appropriate sentence for the defendant in a capital case; (2) N.C.G.S. § 15A-2000(a)(2) does not provide for the exchange of jurors for the sentencing phase based upon their convictions concerning the death penalty; and (3) our Supreme Court has held that death-qualifying a jury is constitutional under both the federal and state Constitutions.

### 22. Appeal and Error— preservation of issues—failure to make offer of proof

Although a defendant contends the trial court erred in a prosecution for first-degree rape, first-degree sexual offense, and assault with a deadly weapon with intent to kill inflicting serious injury by sustaining the prosecutor's objection to a question asked by defendant to a detective on cross-examination concerning the identification of the alleged assailant, defendant failed to preserve this issue for appellate review because: (1) defendant did not make an offer of proof developing the detective's testimony as required by N.C.G.S. § 8C-1, Rule 103(a)(2); and (2) even if the substance of the testimony was apparent from the context, the statement still would have been excluded as hearsay since it was being offered for the truth of the matter asserted.

**23. Evidence— expert opinion—DNA testing**

The trial court did not err in a first-degree rape, first-degree sexual offense, and assault with a deadly weapon with intent to kill inflicting serious injury case by denying defendant's objections and motions to strike the testimony of an expert witness concerning DNA profiles and the expert's conclusions, because: (1) defendant did not specify the reasons for his objections to the expert's testimony with regard to this matter; and (2) contrary to defendant's assertions, the expert's testimony was not based on an inaccurate premise.

**24. Evidence— news media material—still photographs of defendant**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by denying defendant's objection to the State's introduction of still photographs of defendant that were obtained from a videotape made by the news media during a pretrial hearing, because: (1) the State used the photographs to demonstrate the length of defendant's fingernails, and the photographs were cropped in order to show defendant's fingernails and the side of his face; (2) defendant failed to preserve his argument that the introduction of the photographs violated N.C.G.S. § 8C-1, Rules 401 and 403 by failing to present this argument at trial; and (3) even assuming arguendo that the State violated Rule 15(i) of the General Rules of Practice for Superior and District Courts by admitting these photographs, defendant failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and it cannot be concluded that a different result would have been reached at trial absent these photographs.

**25. Evidence— records of victims—motion for in camera inspection**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by denying defendant's broad motion for an in camera inspection of any county or state agency

records relating to the rape/sexual assault victims, because: (1) there was no specific request made for evidence that is obviously relevant, competent, and not privileged; and (2) in regard to defendant's pretrial motion for discovery of medical records, defendant abandoned this issue by asking the trial court to hold the matter open until another motion was heard and defendant thereafter failed to seek a ruling on the motion.

## 26. Appeal and Error— preservation of issues—failure to make an offer of proof

Although defendant contends the trial court erred in a first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by sustaining the State's objections to certain questions asked in regard to the victim's alleged mental problems, defendant failed to preserve this issue because: (1) defendant failed to make an offer of proof; and (2) assuming arguendo that the substance of the testimony was apparent from the context, the statements would still have been excluded as hearsay since they were being offered for the truth of the matter asserted.

## 27. Evidence— defendant's frustrations—absence of prejudice

The trial court did not err in a first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by allowing the testimony of defendant's case manager regarding defendant's frustrations, because defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and it cannot be concluded that a different result would have been reached absent this testimony.

## 28. Identification of Defendants— failure to show prejudice— acquittal of charges

Although defendant contends the trial court erred in an attempted first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by failing to suppress the victim's identification of defendant, defendant was not prejudiced and has no basis for appeal because: (1) defendant was acquitted of the charges relating to this victim; and (2) defendant failed to make an argument to show that this victim's identification of defendant prejudiced his case against the other victims.

**29. Evidence— detective's testimony—victim's knowledge of where defendant ran after attack—what victim told friend about attack**

Even assuming arguendo that the trial court erred in an attempted first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury case by allowing a portion of a detective's testimony to be admitted over defendant's objections regarding the victim's knowledge of where defendant ran after the attack and how a friend acted when the victim told the friend about the incident with defendant, defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a) because: (1) in regard to the detective's testimony as to where the victim said defendant ran, the evidence showed that the police were able to capture defendant shortly after the attack, and any prejudice was thus nullified; and (2) it cannot be concluded that a different result would have been reached at trial had the trial court not admitted the testimony about how the friend acted when the victim told him about the incident.

**30. Evidence— detective's testimony—use of term "sexual assault"**

Even assuming arguendo that the trial court erred in a first-degree murder case by overruling defendant's objection to a detective's testimony using the term "sexual assault" when referring to another of defendant's victims in an assault with a deadly weapon with intent to kill and attempted first-degree rape case, defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a) and it cannot be concluded that a different result would have been reached absent this testimony.

**31. Evidence— prior crimes or acts—testimony of prior victims**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by failing to exclude in one of the murder cases the testimony of two witnesses pertaining to certain prior offenses committed against them by defendant in Georgia, because: (1) the evidence of motive, plan, opportunity, intent, and modus operandi of these alleged offenses was so similar to the offenses for which defendant was charged that the

testimony was admissible under N.C.G.S. § 8C-1, Rule 404(b); (2) the trial court ruled the evidence was admissible in all the cases except in relation to that one murder victim; and (3) defendant did not request that a limiting instruction be given to the jury.

## 32. Evidence— prior crimes or acts—testimony of ex-girlfriend—turbulent relationship

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by allowing defendant's ex-girlfriend to testify under N.C.G.S. § 8C-1, Rule 404(b) about certain aspects of her turbulent relationship with defendant including choking and knife incidents, attacks on the ex-girlfriend and another man, and an incident in which defendant allegedly forcibly stole his ex-girlfriend's purse, because: (1) the testimony concerning the choking incidents was admissible to show motive, plan, common scheme, and intent since defendant had shown a pattern of choking his victims; (2) the relationship between defendant, his ex-girlfriend, and another man was relevant as evidence of motive since defendant had accused the ex-girlfriend and the other man of murdering one of the victims; (3) the evidence of this relationship and defendant's prior bad acts were intertwined with the principal crime; and (4) contrary to defendant's assertion, the admissibility of this testimony was not dependent on the ruling on another witness's testimony.

## 33. Evidence— testimony—corroboration

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by allegedly allowing the jury to decide whether certain testimony from a detective was admissible as corroborative evidence of the testimony of defendant's ex-girlfriend, because: (1) the trial court, and not the jury, decided on the admissibility of this evidence; (2) the trial court gave the jury limiting instructions on the use of corroborative evidence; and (3) defendant failed to preserve his argument that

this evidence was inadmissible under N.C.G.S. § 8C-1, Rule 608 by failing to object at trial on these grounds.

**34. Evidence— testimony—corroboration**

The trial court did not err by allowing certain testimony of a detective to be admitted as corroborative evidence of a witness's testimony pertaining to one of the first-degree murder charges against defendant, because: (1) the witness's testimony about not seeing defendant and the murder victim together could be construed as the witness not seeing defendant and the murder victim in a sexual manner, and the detective's testimony would thus not contradict the witness's testimony; (2) even assuming arguendo that it was error to allow the detective's testimony that the witness told him defendant usually carried a box cutter, defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a) and it cannot be concluded that a different result would have been reached at trial absent this testimony when several of the victims testified that defendant had a box cutter or sharp object when he attacked them; and (3) the testimony regarding the detective describing an event which actually pertained to another case was quickly corrected by the detective once he realized the prosecutor directed the detective to the wrong page of the detective's interview with the witness, and defendant has shown no reason this mistake constituted prejudicial error and that a different result would have been reached.

**35. Evidence— testimony—defendant's reaction after being released from jail**

The trial court did not err in a first-degree murder case by overruling defendant's objections and motions to strike certain testimony by a witness concerning the witness seeing defendant after defendant had been released from jail for taking his ex-girlfriend's purse, because considering the overwhelming evidence against defendant with regard to this case, defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and it cannot be concluded that a different result would have been reached at trial absent this testimony.

**36. Evidence— testimony—defendant's demeanor towards female detective**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflict-

ing serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by allowing the testimony from two detectives concerning defendant's demeanor towards the female detective during their interview of defendant, because: (1) the testimony had no impact on the case considering the overwhelming evidence against defendant; and (2) defendant failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and it cannot be concluded that a different result would have been reached absent this testimony.

**37. Evidence— testimony—defendant's reaction upon seeing victim enter courtroom**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by admitting certain testimony by a detective regarding her observation of defendant's reaction upon his seeing one of the victims enter the courtroom, because: (1) defendant had previously stated to two of the detectives that he did not know this victim, even though other evidence was introduced to the contrary; and (2) the testimony was a reasonable inference that was rationally based on the detective's perception, and it helped to refute defendant's statement that he did not know the victim.

**38. Evidence— exhibits—diagram—photographs**

The trial court did not err in a first-degree murder case by admitting into evidence two exhibits that were used during the interview of defendant on 25 February 1997 including a diagram and some photographs, because: (1) defendant used the diagram and photographs when giving his statement on that date; and (2) defendant's statement has already been ruled admissible, the exhibits were a part of that statement, and defendant has not given any reason to reconsider this issue.

**39. Evidence— demonstration—jury view of crime scene— failure to allow defendant to raise door—changed circumstances**

The trial court did not err in a first-degree murder case by failing to permit defendant to raise a bay roll-up door at the Old

Pine State building during the jury view of the crime scene even though defendant contends he witnessed the murder through the window, because: (1) the trial court did not permit defendant to conduct any demonstrations with regard to the roll-up door since the circumstances at the time of the jury view were not the same as at the time of the offense; (2) defendant failed to show the trial court abused its discretion in determining the demonstration was inappropriate based on changed circumstances; and (3) even if there was error, defendant failed to show a different result would have been reached at trial absent this error.

**40. Evidence— hearsay—statements defendant made while in jail—admission by party exception**

The trial court did not err in a prosecution for two first-degree murders by allowing a witness inmate to testify concerning statements he overheard defendant make while in jail admitting that he killed the victims, because N.C.G.S. § 8C-1, Rule 801(d) allows a statement to be admissible as an exception to the hearsay rule if it is offered against a party and it is his own statement.

**41. Evidence— videotapes—photographs—crime scenes and injuries**

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by admitting into evidence videotapes and photographs that showed crime scenes and injuries with respect to five of the victims, because: (1) defendant lost the benefit of an objection to the introduction of exhibits including photographs of one of the victims during a detective's testimony since defendant failed to object to the introduction of these exhibits when they were previously used to illustrate that victim's testimony, and even if defendant had objected, these exhibits were not so cumulative in nature as to constitute undue prejudice; (2) defendant's general objection to exhibits depicting the crime scene relating to another victim was not adequate to preserve the issue for appellate review; (3) defendant failed to object to the admission of crime scene photographs relating to one of the victims; (4) the videotape and photographs relating to one of the victims were not repetitive and defendant failed to

carry his burden of showing a different result would have been reached absent the introduction of this evidence; (5) the photographs of another victim were not too gruesome or repetitive and cumulative as to violate N.C.G.S. § 8C-1, Rule 403; and (6) the photographs and videotape submitted for another victim were not so gruesome and repetitive as to require their inadmissibility.

**42. Homicide; Rape— first-degree murder—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charges of first-degree murder and first-degree rape regarding one of defendant's victims, because: (1) DNA testing was conducted on the victim's body and a DNA match was found with defendant; (2) the doctor who performed the autopsy concluded the victim died of strangulation, and scrapes and scratches were found on both sides of the victim's neck as well as on the front of her neck; (3) the N.C.G.S. § 8C-1, Rule 404(b) evidence presented at trial showed that defendant would consistently choke his victims while raping or assaulting them; and (4) defendant's statement overheard by a prison inmate that defendant killed those girls provides further evidence in order to survive a motion to dismiss.

**43. Appeal and Error— preservation of issues—failure to object—submission of aggravating circumstances**

Although defendant contends the trial court erred in a double first-degree murder prosecution by submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that a capital felony was committed while defendant was engaged in the commission of a rape or sexual offense, defendant failed to properly preserve this issue because defendant failed to object at trial.

**44. Homicide— first-degree murder—sufficiency of evidence—perpetrator of crime**

The trial court did not err by denying defendant's motion to dismiss one of the first-degree murder charges based on alleged insufficient evidence that defendant was the perpetrator of the crime, because: (1) defendant's shoe prints were found at the scene of the crime; (2) although defendant stated he witnessed the murder through a roll-up door at the building of the crime scene, a detective determined that it was not possible to see the events that defendant described; (3) defendant told the detectives where the murder took place, the nature of the weapon, and

the nature of the blows; (4) defendant lied to a detective and an officer about when he had last seen the victim; (5) the victim had been choked, and the scratches on her neck were consistent with the marks that defendant had left on his other victims; (6) the crime scene was close to several of defendant's other attacks; and (7) a witness inmate overheard defendant say he killed those girls.

### 45. Homicide— first-degree murder—felony murder—sufficiency of evidence—attempted rape

The trial court did not err by denying defendant's motion to dismiss one of the first-degree murder charges based on the felony murder rule using attempted rape as the underlying felony even though defendant contends there was insufficient evidence that defendant attempted to rape the victim, because: (1) the victim's body was found naked except for her shoes and socks; (2) the victim's bra had been cut apart and a couple of buttons appeared to have been torn from her shirt; (3) N.C.G.S. § 8C-1, Rule 404(b) evidence tended to show that defendant lured his victims to isolated locations where he would assault them in part by choking them while raping or attempting to rape them; and (4) evidence showed the victim was choked, and a reasonable inference could be made that defendant attempted to rape the victim.

### 46. Appeal and Error— preservation of issues—failure to object—submission of aggravating circumstances

Although defendant again contends the trial court erred in a double first-degree murder prosecution by submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that a capital felony was committed while defendant was engaged in the commission of a rape or sexual offense, defendant failed to properly preserve this issue because defendant failed to object at trial.

### 47. Criminal Law— jury instruction—alibi

Although defendant contends the trial court erred in a first-degree rape, first-degree sexual offense, and assault with a deadly weapon with intent to kill inflicting serious injury case by failing to give the jury an alibi instruction, defendant failed to properly request the alibi instruction because: (1) defendant did not request the alibi instruction for this case until after the jury charge, and defendant's request was with regard only to a victim of defendant's other crimes; and (2) the evidence in this case was insufficient to support an alibi instruction when the only evi-

dence suggesting alibi was on cross-examination of defendant's ex-girlfriend when she stated that she could not recall when in May 1996 defendant had left for his trip to Georgia.

### 48. Criminal Law— jury instruction—flight

The trial court did not err in a first-degree murder, first-degree rape, first-degree sexual offense, assault with a deadly weapon, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, and assault with a deadly weapon with intent to kill case involving seven different victims over a fifteen-month span by giving a general flight instruction and a flight instruction with regard to the first-degree murder cases, because: (1) defendant has provided virtually no factual support in his brief that the flight instruction was not supported by the evidence; and (2) even if the flight instruction was improper, defendant failed to show prejudice as required by N.C.G.S. § 15A-1443(a) and it cannot be concluded that a different result would have been reached at trial absent this alleged error.

### 49. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity—rebuttal evidence of prior incidents

The trial court did not commit plain error during a capital first-degree murder sentencing proceeding by instructing the jury on the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance of no significant history of prior criminal activity and thereby allowing the State to introduce rebuttal evidence of prior incidents committed by defendant, because: (1) the jury had just found defendant guilty of two counts of first-degree murder, first-degree rape, first-degree sexual offense, two counts of assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree rape, assault with a deadly weapon with intent to kill, and assault with a deadly weapon; and (2) any alleged error by the trial court in allowing the (f)(1) mitigator to be introduced and thereby allowing the State's rebuttal evidence was not so egregious and prejudicial that defendant was not able to receive a fair sentencing proceeding.

### 50. Sentencing— death penalty—International Covenant on Civil and Political Rights

Although defendant contends his execution for two counts of first-degree murder would violate provisions of the International

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

Covenant on Civil and Political Rights based on long delays between sentencing and execution and the conditions in which death row inmates are kept, our Supreme Court has previously decided this issue against defendant and defendant has failed to present new arguments to compel reconsideration of this issue.

### 51. Sentencing— prior record level—noncapital felony convictions

The trial court erred by determining that defendant's prior record level was VI rather than V for sentencing defendant for his noncapital felony convictions, and the case is remanded for resentencing.

### 52. Sentencing— death penalty—not disproportionate

The trial court did not err by sentencing defendant to the death penalty for two counts of first-degree murder, because: (1) defendant was convicted on the basis of both premeditation and deliberation and under the felony murder rule; (2) our Supreme Court has never found a sentence of death to be disproportionate in a case where the jury found a defendant guilty of murdering more than one victim; (3) the jury found the N.C.G.S. § 15A-2000(e)(3), (e)(5), and (e)(11) aggravating circumstances for both murders, each of which standing alone has been held to be sufficient to support a sentence of death; and (4) the jury found the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance as to one of the victims.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Farmer, J., on 4 March 1998 in Superior Court, Wake County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 6 October 2000, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 13 September 2001.

*Roy A. Cooper, Attorney General, by William P. Hart, Special Deputy Attorney General, and William B. Crumpler, Assistant Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

ORR, Justice.

Defendant was indicted 24 February 1997 for assault with a deadly weapon with intent to kill Shelly Jackson. On 31 March 1997, defendant was additionally indicted for the first-degree murders of Deborah Jean Elliot and Patricia Ann Ashe, the first-degree rapes of Jacqueline Crump and Audrey Marie Hall, first-degree sexual offense against Audrey Marie Hall, and two counts of assault with a deadly weapon with intent to kill inflicting serious injury on Jacqueline Crump and Audrey Marie Hall. On 4 August 1997, defendant was indicted in superseding indictments for the attempted first-degree rapes of Vicki LaVerne Whitaker and Kimberly Yvonne Warren, assault with a deadly weapon with intent to kill Kimberly Yvonne Warren, and assault with a deadly weapon with intent to kill inflicting serious injury on Vicki LaVerne Whitaker. Finally, on 20 October 1997, defendant was indicted in superseding indictments for an attempt to commit the first-degree rape of Shelly Jackson and for the first-degree rape of Patricia Ann Ashe.

A jury found defendant guilty of first-degree murder of Patricia Ashe and Deborah Elliot on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of two counts of first-degree rape of Jacqueline Crump and Audrey Hall, first-degree sexual offense of Audrey Hall, assault with a deadly weapon of Kimberly Warren, two counts of assault with a deadly weapon with intent to kill inflicting serious injury of Jacqueline Crump and Audrey Hall, attempted first-degree rape of Shelly Jackson, assault with a deadly weapon with intent to kill Shelly Jackson, and first-degree rape of Patricia Ashe.

The jury found defendant not guilty of two counts of attempted first-degree rape of Vicki Whitaker and Kimberly Warren and assault with a deadly weapon with intent to kill inflicting serious injury of Vicki Whitaker.

Following a capital sentencing proceeding, the jury recommended a sentence of death for each of the murders, and the trial court entered judgments accordingly. The trial court also sentenced defendant to the following additional sentences all of which are to be served concurrent to the sentences of death but consecutive to each other: 480 to 585 months' imprisonment for the first-degree rape of Audrey Hall; 480 to 585 months' imprisonment for the first-degree sexual offense of Audrey Hall; 168 to 211 months' imprisonment for assault with a deadly weapon with intent to kill inflicting serious

injury on Audrey Hall; 480 to 585 months' imprisonment for the first-degree rape of Jacqueline Crump; 145 to 183 months' imprisonment for assault with a deadly weapon with intent to kill inflicting serious injury on Jacqueline Crump; 313 to 385 months' imprisonment for attempted first-degree rape of Shelly Jackson; 59 to 80 months' imprisonment for assault with a deadly weapon with intent to kill Shelly Jackson; and 150 days' imprisonment for assault with a deadly weapon of Kimberly Warren.

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's capital convictions or death sentences. We also find no error meriting reversal of defendant's noncapital convictions. However, we remand the case for resentencing on defendant's noncapital felony convictions at a prior record level V.

With regard to all of the offenses described below as to each victim, the evidence at trial tended to show the following.

## Offenses Relating to Jacqueline Crump

As to Jacqueline Crump, defendant was charged with and convicted of first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury.

Crump had been using cocaine off and on for about thirteen years. At times, Crump would exchange sex for crack or money. On 25 October 1995, Crump left her boyfriend's house to buy a pack of cigarettes. As to much of what happened that night Crump could not remember, but she did testify as to some occurrence she could recall. In her testimony, Crump remembered being at a concrete tunnel that goes under Martin Luther King Boulevard and connects Chavis Park on one side to an area of Old Garner Road on the other side. She could recall walking past the tunnel with two men. The two men were talking about sex when one of them suggested that they go into the tunnel. When Crump refused to go, she was then pushed into the tunnel. One man grabbed Crump by the throat and starting choking her while she was backed up against the wall of the tunnel. He got on top of her and started pushing down her pants while still keeping one hand on her throat. At this point, Crump blacked out.

Raleigh Police Officer David German was dispatched to the scene and arrived at 9:13 a.m. on 26 October. Crump had no clothing on the

bottom half of her body except for a white sock on her left foot. There was blood on the wall and on the floor of the tunnel.

Crump suffered a fractured nose and facial bone fractures, and her eyes were swollen shut. She had a couple of gashes on the side of her head and cuts and bruises on her arms and legs. The evidence at the scene appeared to indicate that Crump was beaten with a beer bottle. DNA testing was subsequently conducted, and it was determined that a match was present between defendant and the vaginal swabs taken from Crump.

### Offenses Relating to Patricia Ashe

As to Patricia Ashe, defendant was charged with and convicted of first-degree murder based on premeditation and deliberation and first-degree rape.

Ashe was a habitual crack cocaine user and possibly a prostitute. On Sunday, 7 January 1996, Officer G.M. Wright of the Raleigh Police Department was dispatched to the 1500 block of South Blount Street. A black male, Rodney Bass, was waving to get the officer's attention. Bass stated that he had seen a person around the back of the building with no clothes on. It had been snowing and sleeting off and on throughout the day. Officer Wright found Ashe's body covered with snow on a bench. The officer observed a set of footprints near the body. These footprints did not get close enough to the body to indicate that the person who left them could have touched the body.

Bass told another officer that he had been drinking in a nearby vehicle and decided to go for a walk. As he was walking behind the building, he saw Ashe's body. He got within twenty or thirty feet of the body and then decided to call the police.

Ashe's body was on the lower portion of the bench, with her feet and lower body hanging off the edge. Her legs were completely off the end of the bench, slightly spread, and her knees were bent. She had no clothes on except white socks. A thermal long-sleeve T-shirt was folded up under her buttocks, and a pair of jeans was folded under her head. A couple of crack pipes and a lighter were underneath or just to the side of the bench. There was snow and ice on Ashe's body, but no snow and ice was underneath her body.

Dr. John Butts performed an autopsy on Ashe's body, and he formed the opinion that Ashe died as a result of strangulation. She had scrapes and scratches on both sides of her neck as well as

some on the front part of her neck. She also had some linear scrapes on her back, some scratches on her left arm, and a small tear in the skin on the right groin area. Some of the neck scratches were relatively deep with a bit of the skin torn off. The multiple scratches and scrapes on Ashe's neck indicate that she had struggled against the perpetrator.

DNA testing was conducted on the vaginal swabs that Dr. Butts took from Ashe, and a DNA match was found with defendant.

## Offenses Relating to Audrey Marie Hall

As to Audrey Hall, defendant was charged with and convicted of first-degree rape, first-degree sexual offense, and assault with a deadly weapon with intent to kill inflicting serious injury.

Audrey Hall had used crack cocaine off and on since 1985 and was actively involved in using crack in May 1996 while living in Raleigh. On various occasions, she exchanged sex for money.

Hall had a friend, Jerry Jones, who lived in southeast Raleigh. Occasionally, when Hall visited Jones at his home, she would use crack. On Saturday, 25 May 1996, Hall went to Jones' house about 5:00 p.m. Hall had been smoking crack that day and got high later that night from smoking crack at Jones' house, where she stayed overnight.

Defendant arrived at Jones' house around 10:00 or 11:00 on Sunday morning and asked if Hall was in the house. Jones woke Hall up to tell her defendant was looking for her. Defendant came into the house and sat down beside Hall. Defendant then asked Hall if she wanted to smoke some cocaine, to which Hall responded affirmatively and proceeded to do so. Eventually, defendant asked Hall if she knew where he could buy some cocaine. Hall agreed to take defendant to a crack house, so they left Jones' house about 3:00 p.m.

Hall intended to take defendant to a crack house that was about two blocks from Jones' house, but defendant said he still had some cocaine and asked if there was some place where they could smoke it. Hall took defendant to a wooded area that is adjacent to South Wilmington Street near some railroad tracks. When they got to the woods, Hall took a "hit" from defendant's cocaine. Defendant motioned for Hall to walk in front of him, and when she did, defendant grabbed her by the throat, squeezed tightly, and threw her on the ground. Defendant began choking Hall and told her to take her

clothes off. Defendant also threatened Hall with a box cutter and made her walk farther into the woods and get on her knees.

Over a relatively short period of time, defendant made Hall put his penis in her mouth as she was on her knees. He told her to do exactly what he said to do if she wanted to get out of those woods alive. Then, defendant pushed Hall on her back, stuffed his penis down her throat and ejaculated. Defendant continued to choke Hall, while holding the box cutter and raping her.

Raleigh Police Officer Kevin Carswell and two other officers were dispatched to the wooded area. The officers found, among other things, some items of clothing, a purse, a watch, and a gold necklace along a path. When the officers eventually found Hall, her arms were stretched over her head, and she was nude except for a dirty white sock on her right foot. Officer Carswell testified that it was apparent that Hall was dragged to the place where she was found. Hall was able to describe her attacker to an officer as a black male with black jeans and a black shirt and carrying a backpack. She also said that defendant was at Jones' house at 203 Bragg Street.

Hall was taken to Wake Medical Center, where she described her assault and her attacker to a nurse. Hall's injuries included cuts on her hand and face and abrasions on her back. She also had some very obvious scratches and bruises on her neck. Vaginal swabs, collected from Hall, and subsequent blood samples from defendant were later subjected to DNA analysis. The analysis by the SBI lab revealed a DNA banding pattern that was consistent with a mixture of the DNA profile for Hall and defendant. Additional DNA testing by another lab revealed that sperm from the vaginal swabbing had genetic characteristics that were consistent with characteristics possessed by defendant. Ultimately, this testing excluded 99.99% of the population from having the same DNA which was found in the sperm taken from the vaginal swabs.

## Offenses Relating to Vicki Whitaker

As to Vicki Whitaker, defendant was charged with and found not guilty of attempted first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury.

Whitaker also had previous experience with crack. According to her testimony, she met defendant at a store on Davie Street around 8:00 p.m. one night in July 1996. Whitaker was walking towards a bar on Hillsborough Street when defendant came up behind her and

started walking with her. Whitaker testified that she told defendant she had to use the bathroom, so defendant took her to a location near a warehouse where a trailer was situated. When Whitaker said that she would not use the bathroom there, defendant grabbed her by the throat. They ended up on the ground, and defendant told Whitaker to take her pants off. Defendant ripped her shirt and got her pants unbuttoned. Defendant put both hands around Whitaker's neck, choked her, and told her that he was going to kill her if she did not take her pants off. She managed to kick defendant in the genitals, and defendant ran away.

Whitaker had many scratches on her neck as a result of this incident. She testified that she did not report the matter to the police until six or seven months later because she was on probation at the time of the incident and was not supposed to be drinking or out at that time of the night.

## Offenses Relating to Kimberly Warren

As to Kimberly Warren, defendant was charged with attempted first-degree rape and assault with a deadly weapon with intent to kill inflicting serious injury. The jury found defendant not guilty of attempted rape, but guilty of assault with a deadly weapon, a misdemeanor.

Warren was homeless and unemployed in November 1996. She would stay at the A.S.K., a store that, through a connected business, offered services as a temporary employment agency. Warren would sleep in the van that belonged to the business. William Hargrove, Warren's friend, was responsible for the van and drove people to work in the van. Defendant was one of the persons that Hargrove would drive to different job sites.

Hargrove introduced Warren and defendant in the van. Warren was using crack cocaine daily during this time. When Warren met defendant, he indicated that he wanted oral sex in exchange for some crack. On some occasions, Warren had exchanged sex for drugs, but she told defendant no because she already had some crack.

Two or three weeks later, Warren saw defendant on Harrington Street near the Greyhound Bus Station. Defendant asked her if she wanted to get high or if she wanted some money. Warren responded that she wanted to get high, so defendant told her to wait down the street near the 42nd Street Oyster Bar. Defendant met her there a few minutes later, and they walked to a warehouse on Hargett Street.

They climbed a fence and went towards a parked trailer. Defendant opened the sliding door on the back of the trailer, they climbed inside, and defendant closed the door halfway. Defendant began to unwrap the crack and then said, "Bitch take your clothes off." When Warren refused, defendant put his hands around her neck, lifted her up, and slammed her against the wall of the trailer. He kept one hand around her neck and produced a sharp object in his other hand. She struggled, managed to get his hand away from her throat, and screamed. Once she screamed, defendant ran away.

Warren went back to Harrington Street and told Hargrove what had happened, which he corroborated at trial, but she did not report it to the police. Her neck was scratched as a result of the incident. Three or four months later, Hargrove pointed Warren out to an officer and told the officer that Warren had said defendant had attacked her. Warren subsequently identified defendant as her attacker from a photograph and a photographic lineup.

## Offenses Relating to Deborah Jean Elliot

As to Deborah Jean Elliot, defendant was charged with and convicted of first-degree murder on the basis of felony murder as well as premeditation and deliberation.

On 23 December 1996, Elliot spoke with one of her sisters about her plans for Christmas. Elliot was supposed to go to her other sister's house about 1:00 p.m. on 24 December to stay for Christmas, but she never arrived. This sister told the police that Elliot was using crack and was a prostitute. One of the last people to see Elliot alive— and the only person who the State could produce as a witness—was Cleon Gibbs, who was the owner/manager of the Martin Street Mini Mart in Raleigh, near Moore Square. Elliot went into the store on the morning of 24 December 1996 to purchase some items.

On 26 December 1996, Oliver Parrish was working at a building on North West Street near downtown Raleigh. The building was formerly part of Pine State Creamery. Parrish had the responsibility of making sure the doors were locked. In a section of the building where there are three bays, he found the body of Deborah Elliot. She was in the second bay, lying face-down, and she was naked except for shoes and socks.

After defendant was arrested on 4 February 1997 for the assault on Shelly Jackson, Marty Ludas, a latent print examiner who was accepted by the trial court as an expert in the field of footwear iden-

tification, received a pair of tennis shoes that had been taken from defendant. Ludas compared the shoes to a shoe print taken from glass pieces that had been put together at the Elliot crime scene. Ludas formed the opinion that only one shoe could have made that shoe print: defendant's left shoe.

Dr. D.E. Scarborough performed an autopsy on Elliot on 27 December 1996. Elliot had a large laceration over the right side of her forehead, and her underlying skull was fractured. She had hemorrhaging over the surface of her brain, and there was actual tearing of the brain relating to the laceration and fracture in her forehead. There were numerous abrasions and scrapes over her arms and legs and substantial bruising, hemorrhaging, and swelling around both of her eyes. Elliot also had multiple scratches over the front and right side of her neck and a small amount of hemorrhaging on the left side of the larynx in the neck.

## Offenses Relating to Shelly Jackson

As to Shelly Jackson, defendant was charged and convicted of assault with a deadly weapon with intent to kill and attempted first-degree rape.

On 4 February 1997, Jackson was at the A.S.K. Store near Moore Square. She had been drinking and using crack during the day. Around 7:00 p.m., Jackson saw defendant leaving William Hargrove's van. Jackson did not know defendant, but they met and talked for awhile. Defendant mentioned that he had some cocaine and said, "Come go with me to my secret place that I go to." Jackson agreed to go with defendant, but she said that she did not want to use any more cocaine for the day. Sex was not discussed in the conversation.

Defendant led Jackson to a fenced-in lot with abandoned vehicles, located off West Hargett Street. Defendant and Jackson climbed into an abandoned truck through a rear roll-up door. As Jackson bent down to put her purse on the floor, defendant stood behind her, grabbed her around the neck, and held her from behind. He had what Jackson thought was a razor in his right hand. Defendant demanded that Jackson take her clothes off, and she refused. As Jackson screamed, defendant said, "Shut up bitch. I got you now. I'm going to kill you." Jackson saw a police car coming down the street, so she managed to break loose, jump out of the truck, and run to the police car.

Sergeant T.C. Earnhart of the Raleigh Police Department was working in the downtown area on 4 February 1997. As he was driving past the back lot of 612 West Hargett Street about 8:00 p.m., he heard a woman's scream and realized there was a possible attack in progress. Earnhart got out of his vehicle and saw a woman, Shelly Jackson, jump out of a truck and run towards his vehicle. Earnhart testified that Jackson was very "frantic" and "hysterical" and said something to the effect that defendant tried to cut her and rape her. Jackson's hand was dripping blood. Jackson testified that defendant was about to cut her throat, so she brought her hand up, which resulted in her hand being cut.

Earnhart saw someone get out of the back of the truck and run away. He radioed for assistance, and within ten minutes, defendant was spotted and apprehended. Defendant was brought back to the crime scene where, Jackson identified him as her attacker. The police found a box cutter in defendant's pants pocket, and one officer observed that defendant's fingernails were particularly long for a male. Defendant had a cut on his right hand and blood on his shirt, and his blood was found inside the truck where the attack on Jackson took place.

Further facts necessary to the discussion of the issues raised by defendant will be presented as needed.

We note at the outset that defendant has presented 244 assignments of error. While defendant has included a constitutional component to almost all of his assignments of error, in most instances, he failed to preserve the constitutional issues at trial and has provided no argument and cited no cases in support of his constitutional arguments to this Court. "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd,* 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001) (citing *State v. Benson,* 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988)); *see also State v. Anthony,* 354 N.C. 372, 389, 555 S.E.2d 557, 571 (2001), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 2002 WL 984307 (June 17, 2002) (No. 01-10030). Furthermore, where defendant includes plain error as an alternative in some of his assignments of error but does not specifically argue or give support in his brief as to why plain error is appropriate, we will not address this aspect of his assignment of error. *See State v. Grooms,* 353 N.C. 50, 66, 540 S.E.2d 713, 723 (2000), *cert. denied,* —— U.S. ——, 151 L. Ed. 2d 54 (2001); *see also* N.C. R. App. P. 10(c)(4). "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or

authority cited, will be taken as abandoned." N.C. R. App. P. 28(b)(6); *see also Lloyd*, 354 N.C. at 87, 552 S.E.2d at 607.

## JOINDER ISSUES

**[1]** In defendant's first question presented before this Court, he contends that the trial court erred when it granted the State's motion to join the charges against defendant for trial. Defendant contends that joinder of these charges violated N.C.G.S. § 15A-926(a) and deprived him of due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 19, 23, 24, and 35 of the North Carolina Constitution. Defendant specifically complains that there were fourteen separate charges involving seven different victims over a fifteen-month span, and the crimes themselves differed significantly. Defendant argues that one of the murders was by strangulation, while the other was by blunt-force head injuries. Also, some of the assaults involved a box cutter, and others did not. All of the crimes occurred in areas of Raleigh infested with drugs and poverty, but some of the crimes occurred indoors and others outdoors. For the reasons stated below, we conclude that joinder was proper in this case.

N.C.G.S. § 15A-926(a) provides:

> Two or more offenses may be joined . . . for trial when the offenses . . . are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan.

N.C.G.S. § 15A-926(a) (2001). In considering a motion to join, the trial judge must first determine if the statutory requirement of a transactional connection is met. *State v. Silva*, 304 N.C. 122, 126, 282 S.E.2d 449, 452 (1981). Whether such a connection exists so that the offenses may be joined for trial is a fully reviewable question of law. *State v. Huff*, 325 N.C. 1, 22, 381 S.E.2d 635, 647 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). Once the trial court determines that the offenses have the requisite transactional connection, the court must determine whether the defendant "can receive a fair hearing on each charge if the charges are tried together." *Id.* at 23, 381 S.E.2d at 647. Furthermore,

> [i]f consolidation hinders or deprives the accused of his ability to present his defense, the charges should not be consolidated. However, the trial judge's decision to consolidate for trial cases having a transactional connection is within the discretion of the

trial court and, absent a showing of abuse of discretion, will not be disturbed on appeal.

*Id.* (citations omitted).

If in hindsight the court's ruling adversely affected defendant's defense, the ruling will not be converted into error. *State v. Jackson*, 309 N.C. 26, 32, 305 S.E.2d 703, 709 (1983). Defendant's remedy in this situation would be to make a motion for severance as provided by N.C.G.S. § 15A-927. *Silva*, 304 N.C. at 127-28, 282 S.E.2d at 453.

Under N.C.G.S. § 15A-927(a), a defendant must make a motion for severance of offenses before trial except that he may do so during trial no later than the close of the State's evidence, if the basis for the motion is a ground not previously known. Defendant waives his right to severance "if the motion is not made at the appropriate time." N.C.G.S. § 15A-927(a)(1) (2001). "If a defendant's pretrial motion for severance is overruled, he may renew the motion on the same grounds before or at the close of all the evidence. Any right to severance is waived by failure to renew the motion." N.C.G.S. § 15A-927(a)(2).

N.C.G.S. § 15A-927(b) further provides that the court must grant a defendant's motion for severance of offenses whenever:

(1) If before trial, it is found necessary to promote a fair determination of the defendant's guilt or innocence of each offense; or

(2) If during trial, upon motion of the defendant or motion of the prosecutor with the consent of the defendant, it is found necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court must consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

N.C.G.S. § 15A-927(b). Whether offenses should be severed is within the sound discretion of the trial judge, and his ruling will not be overturned unless an abuse of discretion can be shown. *State v. Chandler*, 324 N.C. 172, 188, 376 S.E.2d 728, 738 (1989).

The transactional connection required by N.C.G.S. § 15A-926(a) may be satisfied by considering various factors. Two factors frequently used in establishing the transactional connection are a com-

mon *modus operandi* and the time lapse between offenses. *See, e.g.,* *State v. Chapman,* 342 N.C. 330, 343, 464 S.E.2d 661, 668 (1995), *cert. denied,* 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996); *State v. Effler,* 309 N.C. 742, 752, 309 S.E.2d 203, 209 (1983); *State v. Bracey,* 303 N.C. 112, 118, 277 S.E.2d 390, 394 (1981); *State v. Clark,* 301 N.C. 176, 181, 270 S.E.2d 425, 428 (1980).

In this case, the transactional connection was established through numerous factors. First, all of the victims were either prostitutes or had at some time exchanged sex for drugs or money. Also, the victims were all African-Americans and were drug addicts and/or drug users. Defendant's method of assaulting the victims was by strangulation with his hands that often left distinct scratches from defendant's long fingernails. All of the surviving victims, except for Jacqueline Crump because she could not identify the defendant, stated that defendant was well-mannered prior to the assaults but that he would snap instantly and begin assaulting them. Defendant used a knife or box cutter at some point during the assaults. Furthermore, the police were able to use DNA evidence to link defendant to Crump, Ashe, and Hall. All of the offenses occurred within a one-square-mile area, and the incidents took place in a fifteen- to sixteen-month span, with the longest time between offenses being close to five months. Finally, the similarities in these cases were such that the essential evidence in one case would have been admissible in every other case to prove intent, plan, or design. *See, e.g., Effler,* 309 N.C. at 752, 309 S.E.2d at 209; *State v. Corbett,* 309 N.C. 382, 388, 307 S.E.2d 139, 144 (1983); *State v. Greene,* 294 N.C. 418, 422-23, 241 S.E.2d 662, 665 (1978).

The evidence disclosed a similar *modus operandi,* similar circumstances with respect to the type of victims, similar location, and a DNA match between defendant and several of the victims. This Court has stated that public policy favors consolidation because it

> "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once."

*State v. Boykin,* 307 N.C. 87, 91-92, 296 S.E.2d 258, 261 (1982) (quoting *Parker v. United States,* 404 F.2d 1193, 1196 (9th Cir. 1968), *cert. denied,* 394 U.S. 1004, 22 L. Ed. 2d 782 (1969)). We therefore hold that

**STATE v. WILLIAMS**

[355 N.C. 501 (2002)]

the trial court did not abuse its discretion in joining these offenses for trial.

**[2]** In defendant's next question presented, he contends that the trial court erred when it ruled as inadmissible evidence that defendant sought to introduce implicating three other men as possible perpetrators in the Patricia Ashe case. Defendant argues that from October 1995 through February 1997, the period in which the offenses in this case occurred, similar crimes had also been committed. Defendant contends that he had evidence that Rodney Bass, Tyrone McCullers, and Jerry Young were on the State's suspect list for these other crimes and that they may have committed the crimes with which defendant was charged in this case. However, the trial court entered a written order as follows:

> The Court, *ex mero motu*, hereby orders the Defendant and attorneys for the Defendant not to elicit evidence in front of the jury from any witness relating to other possible suspects they contend may have committed any of the crimes for which the Defendant is on trial without prior approval of the Court. Such evidence is inadmissible unless it points directly to a person's guilt other than the Defendant and is inconsistent with the Defendant's guilt.

The trial judge also entered this order orally in court with the parties present.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2001). "The admissibility of evidence of the guilt of one other than the defendant is governed now by the general principle of relevancy." *State v. Cotton*, 318 N.C. 663, 667, 351 S.E.2d 277, 280 (1987).

> Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party. Under Rule 401 such evidence must tend *both* to implicate another *and* [to] be inconsistent with the guilt of the defendant.

*Id.* at 667, 351 S.E.2d at 279-80 (citations omitted).

Defendant points to three potential suspects in this case. First, defendant contends that the trial court erred by not allowing testi-

mony that Rodney Bass had committed the murder. Bass discovered the body of Patricia Ashe and called the police. Bass was living in an abandoned truck about two hundred yards from the crime scene. There was no evidence to indicate that Bass had committed this crime except for his proximity to the crime scene. This evidence does not meet the standard as set forth in *Cotton*.

Next, with regard to Tyrone McCullers, defendant contends it was error for the trial court to deny him the opportunity to call McCullers as a witness and then impeach him with Keisha Ward's testimony. Contrary to McCullers testimony on *voir dire*, Ward testified on *voir dire* that she and McCullers talked about Ashe's death at the warehouse during the snow. According to Ward, Ashe was supposed to meet McCullers that Friday night at the King's Motel, where McCullers was staying. Ward stated that McCullers had seen Ashe's body, and he described the body, particularly as having scratches on her throat. Ward also testified that McCullers saw Ashe being dropped off by a gray or black pickup truck.

"The credibility of a witness may be attacked by any party, including the party calling him." N.C.G.S. § 8C-1, Rule 607 (2001). However,

> extrinsic evidence of prior inconsistent statements may not be used to impeach a witness where the questions concern matters collateral to the issues. Such collateral matters have been held to include testimony contradicting a witness's denial that he made a prior statement when that testimony purports to reiterate the substance of the statement.

*State v. Hunt*, 324 N.C. 343, 348, 378 S.E.2d 754, 757 (1989) (citation omitted). Also, it has been established that prior inconsistent statements may not be used as substantive evidence. *Id.* Therefore, the evidence sought to be introduced by defendant was inadmissible and the trial court did not err by excluding it.

With regard to Jerry Young, he testified on *voir dire* that he met a prostitute, had sex with her without a condom, strangled her with a cord, and then left her on Jones Sausage Road. Defendant claims that the trial judge erred by ruling this testimony inadmissible. However, this evidence does not tend to implicate Young, nor is the evidence inconsistent with the guilt of defendant. *See Cotton*, 318 N.C. at 667, 351 S.E.2d at 280. Thus, the trial court did not err in ruling that this evidence was inadmissible.

**[3]** The next issue defendant brings to the attention of this Court involves the cross-examination of two witnesses for the State in the Audrey Hall case. Defendant contends the trial court erroneously sustained the State's objection to certain questions asked by defendant. First, on cross-examination of Officer Kevin Carswell of the Raleigh Police Department, defendant asked whether Carswell had identified an individual who fit the description given to the police by Hall. The trial court sustained the State's objection to this question.

Defendant did not make an offer of proof to show what Carswell's response to the question would have been. Therefore, defendant has failed to preserve this issue for appellate review under the standard set forth in N.C.G.S. § 8C-1, Rule 103(a)(2). *See State v. Atkins*, 349 N.C. 62, 79, 505 S.E.2d 97, 108 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). The answer to defendant's question was not evident, and "[t]he substance of the excluded testimony was not necessarily apparent from the context within which the question was asked; therefore, an offer of proof was necessary to preserve this issue for appeal." *State v. Braxton*, 352 N.C. 158, 184, 531 S.E.2d 428, 443 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *see also Atkins*, 349 N.C. at 79, 505 S.E.2d at 108; *State v. Geddie*, 345 N.C. 73, 95-96, 478 S.E.2d 146, 157 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997).

Also, even if Carswell had answered defendant's question affirmatively, one can only speculate who Carswell would have identified. Thus, the trial court did not err in sustaining the State's objection.

Next, on cross-examination of Jerry Jones, defendant questioned as follows:

Q. The police interviewed you on January the 6th, 1996, didn't they?

A. They could have.

Q. They interviewed you because you were a suspect in the Pat Ashe murder?

[Prosecutor]: Objection.

The Court: Objection sustained.

The trial judge then excused the jury in order to allow defendant to question Jones on *voir dire*. Defendant argues that this evidence went to the credibility and bias of the witness. However, during *voir*

*dire*, defendant did not ask Jones whether the police interviewed him because he was a suspect in the Ashe murder. Jones did say that he was interviewed by the police on 6 January 1996, but the question that was objected to was whether Jones was being interviewed because he was a suspect in the case. Thus, defendant did not make an offer of proof on this specific question, and therefore, this assignment of error was not preserved for appeal. Also, the mere fact of Jones being interviewed by the police does not raise an issue concerning the credibility or bias of a witness.

**[4]** Defendant's next question presented concerns testimony from Detective J.D. Turner with regard to the Deborah Elliot case. Defendant argues that it was error for the trial court to exclude certain hearsay testimony from Turner regarding his interview with Donald Jones. The trial court ruled that Jones was unavailable under N.C. R. Evid. 804(a)(5) and then allowed defendant to make an offer of proof outside the presence of the jury. On *voir dire*, Turner testified that Jones told him that Jones had seen Deborah Elliot alive on Christmas day, the day before the discovery of her body in the Pine State building. Defendant contends that this evidence was crucial because if Elliot was killed on Christmas day, then defendant had an alibi.

North Carolina Rule of Evidence 804(b) provides for certain exceptions to the hearsay rule when the declarant is determined to be unavailable under North Carolina Rule of Evidence 804(a). Rule 804(b)(5) reads, in part, as follows:

> (5) Other Exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C.G.S. § 8C-1, Rule 804(b)(5) (2001). Under this rule, once the trial court finds that the declarant is unavailable under N.C. R. Evid. 804(a), the trial judge must engage in a six-part inquiry to determine the admissibility of the hearsay evidence under this exception. *State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986).

First, defendant did not establish that Jones' testimony possessed equivalent circumstantial guarantees of trustworthiness. At one point during the *voir dire* of Turner, he was asked whether Jones had changed his story about whether he had seen Elliot on Christmas day. Turner testified that Jones had initially stated that he was 100% sure that he had seen Elliot alive on Christmas day, but later stated that he was 85% sure. Also, Ireace Small testified that she saw Elliot on Christmas day. In this case, the testimony of Small, an eyewitness, was more probative than Jones' hearsay statement regarding Elliot being alive on Christmas day. *See* N.C.G.S. § 8C-1, Rule 804(b)(5)(B). Moreover, the trial judge specifically concluded that "the general purposes of these rules and the interests of justice will not be best served by the admission of [Jones'] statement." Thus, defendant has not shown error on this issue.

**[5]** Defendant next contends that the trial court erred in sustaining the State's objections to two questions that defendant asked Detective J.R. Poplin on cross-examination with respect to the Patricia Ashe case. Defendant also contends the trial court erred by overruling his motion to strike certain testimony that Detective Poplin gave on redirect examination.

First, defendant asked Detective Poplin whether he considered impotence or the use of a condom in his investigation of the Ashe murder. Defendant's objective was allegedly to show that if the perpetrator was impotent or used a condom, then his DNA would not be found in the victim. Defendant then asked Detective Poplin, "In your investigation of Rodney Bass did you consider impotence?" The trial court sustained the State's objection to this question. Also, in referring to another possible perpetrator, defendant asked Detective Poplin if "[o]n January 4th, 1996 a prostitute was found strangled but alive on Jones Sausage Road." Once again, the trial court sustained the State's objection to this question. Subsequent to these two objections being sustained, defendant made an offer of proof. Defendant showed that Detective Poplin did not take into account impotence when attempting to eliminate Rodney Bass as a suspect. Defendant also showed that Detective Poplin investigated and found that Jerry Wayne Young strangled a prostitute on Jones Sausage Road on 4 January 1996.

After hearing defendant's offer of proof as to both questions, the trial court sustained both objections to this evidence, stating that

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

[N]either the State [n]or the defendant may present evidence that some other person may have committed the crime that the defendant is charged with, unless the evidence points directly to another person's guilt and is inconsistent with the defendant's guilt. . . . There's no evidence that the court sees that—or the evidence presented does not point to anybody else's guilt of the crime the defendant is charged with.

*See also Cotton*, 318 N.C. at 667, 351 S.E.2d at 279-80. We agree with the trial court's ruling as to both of the questions defendant asked Detective Poplin. Considering all of the evidence against defendant and the fact that defendant's DNA was found on vaginal swabs taken from Ashe, we hold that defendant has not carried his burden to show that there was "evidence which tends *both* to implicate another *and* [to] be inconsistent with the guilt of the defendant." *Id.* Therefore, we conclude that the answers by Detective Poplin were irrelevant under N.C.G.S. § 8C-1, Rule 401.

Defendant also complains that the trial court erred by overruling his motion to strike certain testimony that Detective Poplin gave on redirect examination, which proceeded as follows:

Q. And you've been asked a number of questions about different people that you spoke with and different people that you interviewed, and people that may have been a suspect or suspects at different points in this investigation. After the defendant made his statement on February the 25th of 1997, did your investigation become more focused?

A. Yes, it did.

Q. And upon whom did you focus after February the 25th of 1997?

A. On the defendant. All the evidence tended to focus directly to the defendant.

[DEFENSE COUNSEL]: Objection. Move to strike.

THE COURT: Overruled.

Q. As a result of the defendant's statement, did you focus on three possibilities?

A. Yes.

Q. As far as people that were there at the time of the murder?

A. That is correct.

Q. And who did you focus on?

A. The defendant, [Derrick] Jackson, and Cynthia Pulley.

Defendant has not carried his burden to show prejudice to any alleged error by the trial court with regard to the preceding question and answer. *See* N.C.G.S. § 15A-1443(a) (2001). Defendant objects to this testimony on the basis that it was conclusory, and that the testimony related to the Ashe murder. From reading the transcript, we find that the questions and answers refer to the Elliot murder, not the Ashe murder. Furthermore, Poplin also testified that his investigation focused on Jackson and Pulley, not just defendant. The investigation proceeded in this manner because of defendant's statement of 25 February 1997 in which defendant implicated Jackson and Pulley. Thus, any alleged prejudice that may have resulted from Poplin's testimony was rendered moot when Poplin testified that other people were included in his investigation. Thus, this assignment of error is overruled.

[6] Next, defendant contends that the trial court erred by excluding evidence of an alternative suspect in the Jacqueline Crump case. At trial, defense counsel asked Detective Poplin if he had determined whether there was a relationship between Shawn Sanders and the "victim." However, the State argues that defendant has misconstrued the particular transcript page that he has relied upon in support of this assignment of error. More specifically, the State contends that the question, from which the trial court sustained the State's objection, actually pertained to Patricia Ashe, not Jacqueline Crump.

Even assuming that the questioning pertained to Jacqueline Crump, we find no error. As stated previously,

[e]vidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party. Under Rule 401 such evidence must tend *both* to implicate another *and* [to] be inconsistent with the guilt of the defendant.

*Cotton*, 318 N.C. at 667, 351 S.E.2d at 279-80 (citations omitted). Defendant has not shown that any evidence implicated Sanders, nor has he shown any evidence that would be inconsistent with the guilt of defendant. Therefore, this assignment of error is overruled as it pertains to this issue.

**[7]** Defendant next argues that the trial court erred by denying his written motions for pretrial discovery relating to other suspects and to other offenses with which defendant was not charged. Specifically, defendant contends that the trial court erred when it denied his request for the following: (1) police files dealing with any other murders or rapes having a common *modus operandi* with the crimes charged against defendant and the identification of all persons identified as suspects in those crimes; (2) evidence relating to another suspect, John Wesley, in the Jacqueline Crump case; (3) evidence relating to Christopher Barnette as a suspect in the crimes charged against defendant; and (4) evidence relating to other murders and rapes in which defendant was a suspect. Defendant argues that the trial court's denial of his motions violated his due process and confrontation rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 23 and 35 of the North Carolina Constitution. We disagree.

"The United States Supreme Court has held that due process does not require the State to make complete disclosure to defendant of all of the investigative work on a case." *State v. Hunt*, 339 N.C. 622, 657, 457 S.E.2d 276, 296 (1994) (citing *Moore v. Illinois*, 408 U.S. 786, 33 L. Ed. 2d 706 (1972)). " '[N]o statutory provision or constitutional principle requires the trial court to order the State to make available to a defendant all of its investigative files relating to his case . . . .' " *Id.* (quoting *State v. McLaughlin*, 323 N.C. 68, 85, 372 S.E.2d 49, 61 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990)). Furthermore, N.C.G.S. § 15A-904(a) provides:

> (a) Except as provided in G.S. 15A-903(a), (b), (c), and (e), this Article does not require the production of reports, memoranda, or other internal documents made by the prosecutor, law-enforcement officers, or other persons acting on behalf of the State in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State.

N.C.G.S. § 15A-904(a) (2001); *see also State v. Brewer*, 325 N.C. 550, 574, 386 S.E.2d 569, 582 (1989) (stating the general rule that the work product or investigative files of the district attorney, law enforcement agencies, or others assisting in the preparation of the case are not open to discovery), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541 (1990).

Pretrial discovery is governed by statute, and defendant has not cited any statute that would give the trial court the authority to grant defendant's motions. Moreover, "defendant is not entitled to the granting of his motion 'for a fishing expedition.' " *State v. Heatwole*, 344 N.C. 1, 23, 473 S.E.2d 310, 321 (1996) (quoting *State v. Davis*, 282 N.C. 107, 111-12, 191 S.E.2d 664, 667 (1972)), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). Also, defendant has shown no violation of the Due Process Clause by the trial court denying these motions. Thus, the assignments of error presented by this issue are without merit.

## PRETRIAL ISSUES

[8] Defendant next argues that the trial court erred in denying his motion to continue, and he contends that this denial violated his constitutional rights. Defendant argues that he had a mitigation expert who needed additional time to look into possible additional information. Defendant also wanted additional time to investigate similar offenses that had occurred but with which defendant had not been charged. For the following reasons, we conclude that the trial court did not err in denying defendant's motion.

> A motion for a continuance is ordinarily addressed to the sound discretion of the trial court, and the ruling will not be disturbed absent a showing of abuse of discretion. When a motion to continue raises a constitutional issue, however, the trial court's ruling thereon involves a question of law that is fully reviewable on appeal by examination of the particular circumstances presented in the record. Even when the motion raises a constitutional issue, denial of the motion is grounds for a new trial only upon a showing that "the denial was erroneous and also that [defendant] was prejudiced as a result of the error." [*State v.*] *Branch*, 306 N.C. [101,] 104, 291 S.E.2d [653,] 656 [(1982)].

*State v. Blakeney*, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000) (citations omitted), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). Defendant has shown no evidence that the lack of additional time prejudiced his case. "To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense." *State v. Tunstall*, 334 N.C. 320, 329, 432 S.E.2d 331, 337 (1993). "To demonstrate that the time allowed was inadequate, the defendant must show 'how his case would have been better prepared had the continuance been granted or that he was materially prejudiced by the denial

of his motion.' " *Id.* (quoting *State v. Covington,* 317 N.C. 127, 130, 343 S.E.2d 524, 526 (1986)). Defendant has been unable to show that he was materially prejudiced or that he would have been better prepared had the continuance been granted. Therefore, we conclude that the trial court did not abuse its discretion, and we thus overrule this assignment of error.

[9] Defendant's next contention is that the short-form murder indictment violated his federal constitutional rights on the grounds that it failed to allege all the elements of first-degree murder and that the indictment failed to include any of the aggravating circumstances upon which defendant's death eligibility was based.

First, we have held that " 'the State need not set forth in an indictment the aggravating circumstances upon which it will rely in seeking a sentence of death.' " *State v. Golphin,* 352 N.C. 364, 396, 533 S.E.2d 168, 193 (2000) (quoting *State v. Young,* 312 N.C. 669, 675, 325 S.E.2d 181, 185 (1985)), *cert. denied,* 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *see also Chapman,* 342 N.C. at 339, 464 S.E.2d at 666. Also, in support of his challenge that the short-form indictment was unconstitutional, defendant cites the United States Supreme Court's decisions in *Jones v. United States,* 526 U.S. 227, 143 L. Ed. 2d 311 (1999), and *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435 (2000). However, this Court has repeatedly addressed and rejected this argument. *See, e.g., Braxton,* 352 N.C. at 173-75, 531 S.E.2d at 437-38; *State v. Wallace,* 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Defendant has presented no compelling reason for this Court to reconsider the issue in the present case. Accordingly, this assignment of error is overruled.

[10] Defendant next complains that the trial court erred by denying defendant's pretrial motion for a bill of particulars, requesting the following information:

1. The exact time of day or night of the alleged offense or offenses.

2. The exact location in the county or city in which the alleged crime and arrest of defendant took place.

3. The name and address or other identifying information of all persons present during the alleged crime and at the arrest of the defendant.

Defendant contends that the requested information was necessary to clarify the charges against him and to prepare his defense. We disagree.

N.C.G.S. § 15A-925(c), which governs motions for bills of particulars, reads as follows:

> If any or all of the items of information requested are necessary to enable the defendant adequately to prepare or conduct his defense, the court must order the State to file and serve a bill of particulars. Nothing contained in this section authorizes an order for a bill of particulars which requires the State to recite matters of evidence.

N.C.G.S. § 15A-925(c) (2001). "The grant or denial of a bill of particulars is generally within the discretion of the trial court and is not subject to review 'except for palpable and gross abuse thereof.' " *State v. Easterling*, 300 N.C. 594, 601, 268 S.E.2d 800, 805 (1980) (quoting *State v. McLaughlin*, 286 N.C. 597, 603, 213 S.E.2d 238, 242 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976)). "[A] denial of a defendant's motion for a bill of particulars will be held error only when it clearly appears to the appellate court that the lack of timely access to the requested information significantly impaired defendant's preparation and conduct of his case." *Id.*

In this case, defendant has not shown that the information requested was necessary to enable defendant to adequately prepare or conduct his defense; thus, defendant has not proven palpable and gross abuse of discretion on the part of the trial court. The prosecution provided defendant with open file discovery in this case. Defendant received copies of the victims' statements, and he received copies of every police report that had been prepared in connection with the particular investigations. All of the information that defendant requested was in these materials. Furthermore, "[d]efendant does not suggest surprise or specify in what manner the denial of [his] motion[] for a bill of particulars affected [his] trial strategy." *State v. Moore*, 335 N.C. 567, 588, 440 S.E.2d 797, 809, *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d 174 (1994). Therefore, we hold that the trial court did not err in denying defendant's motion for a bill of particulars.

[11] Next, defendant argues that the trial court erred by denying defendant's motion for funds in order to hire an expert to prove the necessity for a change of venue. Defendant filed a pretrial motion for

change of venue or, alternatively, for a special venire from another county. Also, defendant requested funds for a jury-selection expert in order to establish the degree and extent of pretrial publicity and the impact of such publicity upon the jury and to analyze and determine other possible venues. The trial court denied defendant's motion in its entirety.

> In order to receive state-funded expert assistance, an indigent defendant must make "a particularized showing that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case." *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992). Furthermore, "the State is not required by law to finance a fishing expedition for the defendant in the vain hope that 'something' will turn up." *State v. Alford*, 298 N.C. 465, 469, 259 S.E.2d 242, 245 (1979). "Mere hope or suspicion that such evidence is available will not suffice." *State v. Tatum*, 291 N.C. 73, 82, 229 S.E.2d 562, 568 (1976).

*State v. McNeill*, 349 N.C. 634, 650, 509 S.E.2d 415, 424 (1998) (citation omitted), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999).

In the present case, defendant has not shown any evidence that he was deprived of a fair trial because of the absence of a jury-selection expert or that there was a reasonable likelihood that the expert would have been able to materially assist him in the preparation of his case. Since defendant has been unable to provide any evidence to support his assignment of error, we conclude that the trial judge did not abuse his discretion in denying defendant's request for funds.

**[12]** Defendant next contends that the trial court erred by denying his pretrial motions for disclosure of the criminal records of the witnesses and victims involved in the cases against him. Defendant also requested orally for an order allowing his investigator to have access to the Police Information Network (PIN) controlled by the State from which the criminal records could be obtained. The trial court denied defendant's pretrial motions and his oral request.

This Court has held "that no statutory or constitutional principle requires a trial court to order the State to make a general disclosure of criminal records of the State's witnesses." *State v. Gibson*, 342 N.C. 142, 149-50, 463 S.E.2d 193, 198 (1995). Furthermore, "the failure of the court to order the disclosure of the State's witnesses' criminal records is not violative of due process." *State v. Alston*, 307 N.C. 321,

338, 298 S.E.2d 631, 643 (1983); *see also State v. Walls,* 342 N.C. 1, 26, 463 S.E.2d 738, 749 (1995), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). Also, in *State v. Thomas,* this Court upheld a trial court's denial of a defendant's request for access to the PIN. 350 N.C. 315, 340, 514 S.E.2d 486, 501-02, *cert. denied,* 528 U.S. 1006, 145 L. Ed. 2d 388 (1999). This Court concluded that defendant had no right to the information sought. *Id.*

As this Court concluded in *Thomas,* we also conclude that "the record in this case discloses that the prosecution witnesses were cross-examined rigorously and extensively by both defense attorneys." *Id.* at 340, 514 S.E.2d at 502. Furthermore, "[t]here was ample evidence presented to the jury for impeachment purposes. We fail to see how any additional impeaching evidence gleaned from the criminal records of these witnesses would have created a reasonable doubt of defendant's guilt which did not otherwise exist." *Id.* Accordingly, these assignments of error are overruled as to this question presented.

**[13]** Next, defendant argues that the trial court erred by denying his request to question jurors during jury selection on their understanding about parole eligibility for a life sentence. Defendant acknowledges that this Court has previously decided this issue against him, but defendant asks this Court to reexamine its position in light of *Shafer v. South Carolina,* 532 U.S. 36, 149 L. Ed. 2d 178 (2001). We decline to do so.

This Court has held "that a trial court does not err by refusing to allow *voir dire* concerning prospective jurors' conceptions of the parole eligibility of a defendant serving a life sentence." *State v. Smith,* 347 N.C. 453, 460, 496 S.E.2d 357, 361, *cert. denied,* 525 U.S. 845, 142 L. Ed. 2d 91 (1998); *see also State v. Neal,* 346 N.C. 608, 617-18, 487 S.E.2d 734, 739-40 (1997), *cert. denied,* 522 U.S. 1125, 140 L. Ed. 2d 131 (1998); *State v. Chandler,* 342 N.C. 742, 749-50, 467 S.E.2d 636, 640, *cert. denied,* 519 U.S. 875, 136 L. Ed. 2d 133 (1996); *State v. Skipper,* 337 N.C. 1, 24, 446 S.E.2d 252, 264 (1994), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). Defendant has failed to establish any compelling reason why this Court should reconsider its prior holdings on this issue. Therefore, this assignment of error is overruled.

**[14]** Defendant's next contention involves the trial court's denial of his motion to suppress a statement he gave to the Raleigh Police Department on 25 February 1997. Defendant was arrested on 4

**STATE v. WILLIAMS**

[355 N.C. 501 (2002)]

February 1997 and was advised of his *Miranda* rights. He declined at that time to make a statement. On 6 February, counsel was appointed. Prior to giving his statement on 25 February, defendant initiated contact with the police and stated that he had information for them. Subsequently, defendant was transported to the Raleigh Police Department.

The motion was subsequently heard, and an oral motion was entered in open court and subsequently reduced to writing. The trial court found as fact that defendant was again advised of his *Miranda* rights, that he signed a waiver of rights form, and that he indicated that he understood his rights and wished to waive them. The trial court also found that defendant was further advised by the officers that he was still represented by counsel and that defendant waived his right to have his attorney present. The trial court concluded as a matter of law that defendant knowingly, intelligently, and voluntarily waived his right to counsel and his right to have an attorney present on 25 February 1997.

. The trial court denied defendant's motion to suppress the entire statement, but granted defendant's motion to suppress that part of the statement occurring after defendant asserted his right to remain silent. Defendant contends that the trial court's failure to suppress the statement violated his Fifth and Sixth Amendment rights. Defendant further contends that the suppression motion raised the issue of whether the statement should be suppressed because it was obtained in violation of North Carolina Code of Professional Ethics Rule 7.4(1), which is now embodied in Rule 4.2(a) of the North Carolina Code of Professional Ethics. We disagree with both contentions.

First, with regard to defendant's Fifth Amendment right to counsel, once a defendant has expressed his desire to have counsel present during custodial interrogation, police questioning must cease. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386 (1981); *State v. Warren*, 348 N.C. 80, 97, 499 S.E.2d 431, 440, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998). However, if "the accused himself initiates further communication, exchanges, or conversations with the police," then the defendant may be able to waive his Fifth Amendment right to counsel and the police may be able to proceed with the interrogation. *Id.* Furthermore, a defendant may waive his Sixth Amendment right to counsel in the same manner as he may waive his Fifth Amendment right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 101 L. Ed. 2d 261 (1988).

**STATE v. WILLIAMS**

[355 N.C. 501 (2002)]

As previously stated, defendant reinitiated contact with the police in order to provide them with information with regard to the crimes against Shelly Jackson and Deborah Elliot. The detective fully advised defendant of his rights and that he was represented by counsel, and defendant signed a waiver of rights form. Defendant also acknowledged that he understood his rights, that he wished to waive his rights, and that he wished to proceed without counsel. Thus, the trial court properly denied defendant's motion to suppress and determined that defendant waived his right to counsel on 25 February 1997. We also note that the trial court ruled that part of defendant's statement was inadmissible because defendant invoked his right to remain silent during the interrogation.

As previously stated, defendant also contends that the statement should be suppressed because it was obtained in violation of North Carolina Code of Professional Ethics Rule 7.4(1), which is now embodied in Rule 4.2(a). Defendant contends that the district attorney's office was contacted prior to the interrogation of defendant and that the rule prohibits an attorney for one party from contacting a represented party without contacting the adverse attorney. Since there is no factual basis in the record for this contention, we decline to address the issue. Therefore, this assignment of error is overruled.

**[15]** By another question presented, defendant argues that the trial court erred by denying his pretrial motion *in limine* to redact that part of his statement from 25 February 1997 which referred to the "electric chair" and a reference to defendant allegedly being "beaten up by men hired by a girl who knew the defendant."

With regard to the reference to the electric chair, defendant stated the following to the detectives: "I'll tell you what. You want to know how much I care about Cynthia? Go get me an electric chair and plug it up right there and let me pop the switch on it. If she get time, I would love to be there to see it." Defendant and Cynthia Pulley had broken up as a couple, and defendant had accused Cynthia Pulley of participating in the murder of Elliot. Thus, this statement is relevant under N.C.G.S. § 8C-1, Rule 401 in order to show defendant's bias against Pulley.

With regard to the statement about the men beating up defendant, he now contends that this was hearsay, but defendant did not specify hearsay as a basis for objecting to this part of the statement. Thus, he has not properly preserved this argument for appellate review. *See* N.C. R. App. P. 10(b)(1).

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

Overall, trial courts have discretion in deciding whether to grant a motion *in limine, State v. Hightower*, 340 N.C. 735, 746-47, 459 S.E.2d 739, 745 (1995), and we conclude that the trial court did not abuse its discretion in this situation. Therefore, the assignments of error presented under this issue are overruled.

[16] Defendant next contends that the trial court erred in denying his pretrial motion to suppress evidence of the show-up identification of him by Shelly Jackson in violation of his constitutional rights. However, defendant failed to object to the testimony introduced at trial pertaining to the show-up identification. This Court has held that a pretrial motion to suppress is not sufficient to preserve for appellate review the issue of admissibility of evidence. *Grooms*, 353 N.C. at 65-66, 540 S.E.2d at 723; *Golphin*, 352 N.C. at 405, 533 S.E.2d at 198. Accordingly, this assignment of error is overruled.

[17] Next, defendant contends that the trial court erred by failing to suppress the identification of defendant by Kimberly Warren. Warren was able to pick out defendant at a photographic lineup as the man who attacked her. Defendant filed a pretrial motion to suppress Warren's identification, and the trial court subsequently denied this motion. Subsequent to this denial, the prosecution notified defendant that Warren had seen a photograph of defendant prior to the lineup. Thus, defendant filed a renewed motion to suppress the identification. The trial court reserved ruling on the renewed motion until trial in order to see what the testimony of the witnesses developed.

At trial, Warren testified specifically that she was able to pick defendant out of a photographic lineup shown to her by Detective Turner, but defendant did not object to this testimony. However, when Detective Turner testified about the photographic lineup, defendant objected. Defendant now claims the trial court erred by overruling his objections.

This Court has held that "[w]here evidence is admitted over objection and the same evidence has been previously admitted . . . , the benefit of the objection is lost." *State v. Alford*, 339 N.C. 562, 570, 453 S.E.2d 512, 516 (1995). Defendant objected to testimony by Turner that was previously admitted by Warren without objection. Therefore, defendant has lost the benefit of that objection. Furthermore, defendant did not request a ruling on his renewed motion pertaining to the photographic lineup, and therefore, he did not properly preserve these assignments of error. *See* N.C. R. App. P.

10(b)(1). Accordingly, the assignments of error pertaining to this question presented are overruled.

[18] Defendant's next contention is that the trial court erred by denying his motion to suppress a photographic lineup identification and in-court identification by Audrey Hall identifying defendant as her attacker. Defendant filed a general pretrial motion to suppress any pretrial identification or in-court identification of defendant that was impermissibly suggestive. In ruling that the motion was not specific enough, *see* N.C.G.S. § 15A-977 (2001), the trial judge denied defendant's motion "subject to the Defendant's right to file a more specific motion or motions directed to a particular identification of the Defendant by a specific victim or other witness."

Defendant did not file any subsequent motion, although he did conduct a *voir dire* of Hall during trial in which he reiterated his pretrial motion. However, because defendant chose not to exercise his option of refiling a more specific motion, the court again denied defendant's motion to suppress. Furthermore, we note that defendant did not object to Hall's testimony, in which she identified him as her assailant numerous times. Thus, (1) defendant did not refile a more specific motion to suppress, and (2) he failed to object to the disputed evidence once it was admitted in open court. As a consequence, we conclude that the trial court did not err in denying his motions to suppress. Moreover, Detective Poplin testified at trial without objection that Hall had identified defendant as her assailant. Therefore, defendant has also waived any right to raise these objections on appeal. *See Alford,* 339 N.C. at 569-70, 453 S.E.2d at 515-16.

## JURY *VOIR DIRE* ISSUES

[19] By another question presented, defendant contends that the trial court erred in denying his motions to dismiss jury panels because defendant's race was disproportionately underrepresented in the composition of the jury panels. We disagree.

"Our state and federal Constitutions protect a criminal defendant's right to be tried by a jury of his peers." *State v. Bowman,* 349 N.C. 459, 467, 509 S.E.2d 428, 434 (1998) (citing U.S. Const. amend. VI; N.C. Const. art. I, §§ 24, 26), *cert. denied,* 527 U.S. 1040, 144 L. Ed. 2d 802 (1999). "This constitutional guarantee assures that members of a defendant's 'own race have not been systematically and arbitrarily excluded from the jury pool which is to decide [his] guilt or innocence.'" *Id.* (quoting *State v. McNeill,* 326 N.C. 712, 718, 392

S.E.2d 78, 81 (1990)). However, the Sixth Amendment does not guarantee a defendant "the right to a jury composed of members of a certain race or gender." *State v. Norwood,* 344 N.C. 511, 527, 476 S.E.2d 349, 355 (1996), *cert. denied,* 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

In order for defendant to establish a *prima facie* violation for disproportionate representation in a venire, he must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 58 L. Ed. 2d 579, 586-87 (1979); *see also Blakeney,* 352 N.C. at 297, 531 S.E.2d at 808; *Bowman,* 349 N.C. at 467-68, 509 S.E.2d at 434; *McNeill,* 326 N.C. at 717, 392 S.E.2d at 81; *State v. McCoy,* 320 N.C. 581, 583, 359 S.E.2d 764, 765 (1987). We conclude that defendant has failed to establish the second and third prongs of the *Duren* test.

With regard to the second prong, defendant submitted statistics showing that the African-American population of Wake County was 20.8% in 1997 and that African-Americans made up 8.67% of the jury pool, for a difference of 12.13%. In *Bowman,* this Court held that a difference of 16.17% was insufficient as a matter of law to conclude that the representation of African-Americans was not fair and reasonable in relation to their representation in the community. *Bowman,* 349 N.C. at 468, 509 S.E.2d at 434. Furthermore, in *State v. Price,* this Court held that a 14% difference was insufficient to show that the representation was unfair and unreasonable. 301 N.C. 437, 447-48, 272 S.E.2d 103, 110-11 (1980). Therefore, we conclude that a difference of 12.13% is insufficient, in and of itself, to conclude that the representation of African-Americans in this venire was not fair and reasonable in relation to their population in the community.

With regard to the third prong of the *Duren* test, we note that defendant has presented no evidence showing that the alleged deficiency of African-Americans on the jury was because of the systematic exclusion of this group in the jury-selection process. " '[T]he fact

that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the [Equal Protection] Clause.' " *State v. Avery*, 299 N.C. 126, 130, 261 S.E.2d 803, 806 (1980) (quoting *Washington v. Davis*, 426 U.S. 229, 239, 48 L. Ed. 2d 597, 607 (1976)). Overall, the only evidence defendant offered in support of his contention that his race was disproportionately underrepresented in the composition of the jury panels was statistics. Therefore, based on the foregoing, this assignment of error is overruled.

[20] Defendant's next argument relates to the State's peremptory challenges of prospective jurors Marion Hairston and Henry Smith, who are both African-American. Defendant contends that the trial court violated defendant's constitutional rights by allowing the State to exercise peremptory challenges against these two African-American prospective jurors. Defendant argues that these peremptory challenges were based solely on race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). We disagree.

> The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit a prosecutor from peremptorily excusing a prospective juror solely on the basis of his or her race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); *State v. Floyd*, 343 N.C. 101, 106, 468 S.E.2d 46, 50, *cert. denied*, [519] U.S. [896], 136 L. Ed. 2d 170 (1996). A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a race-neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

*State v. Lemons*, 348 N.C. 335, 360-61, 501 S.E.2d 309, 324-25 (1998), *sentence vacated on other grounds*, 527 U.S. 1018, 144 L. Ed. 2d 768 (1999).

In this case, although the trial court ruled that defendant had not made a *prima facie* showing that the peremptory challenges were exercised on the basis of race, the State offered race-neutral explanations anyway in response to defendant's *Batson* challenge. The

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

trial court accepted the State's explanations as valid reasons for using the peremptory challenges. " 'Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.' " *Id.* at 361, 501 S.E.2d at 325 (quoting *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405). Therefore, "the only issue for us to determine is whether the trial court correctly concluded that the prosecutor had not intentionally discriminated." *Id.* Since "the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error." *Id.* (citing *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412).

With regard to prospective juror Hairston, the prosecutor told the trial court that she excused this juror because Hairston had counseled inmates on death row and others involved in similar crimes, because Hairston started crying when questioned about her counseling, and because Hairston stated concerns that it would be very difficult for her to impose the death penalty.

With respect to prospective juror Smith, the prosecutor informed the trial court that the State would be relying heavily on scientific evidence. The prosecutor was concerned that Smith had only a sixth-grade education and that he had a problem understanding some basic words from the questions asked and from the jury questionnaire.

"Taken singly or in combination, the State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during *voir dire*." *State v. Robinson*, 336 N.C. 78, 99, 443 S.E.2d 306, 315 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). Thus, the trial court correctly determined that the peremptory challenges of these specific jurors was not based solely upon their race. Therefore, the assignments of error with regard to this issue are overruled.

[21] Next, defendant contends that the trial court violated his constitutional rights by denying his motions to allow jurors who were opposed to the death penalty to sit as jurors in the guilt-innocence phase of the trial. Defendant concedes that this issue has been decided against him, but he requests this Court to reconsider the issue.

This Court has held that N.C.G.S. § 15A-2000(a)(2) provides that the same jury that determines the guilt of a defendant should recom-

mend the appropriate sentence for the defendant in a capital case. *See, e.g., State v. Bondurant*, 309 N.C. 674, 682, 309 S.E.2d 170, 176 (1983). N.C.G.S. § 15A-2000(a)(2) "does not provide for the exchange of jurors for the sentencing phase based upon their convictions concerning the death penalty." *Id.* Furthermore, this Court has held that "death-qualifying" a jury is constitutional under both the federal and state Constitutions. *State v. Conner*, 335 N.C. 618, 627-28, 440 S.E.2d 826, 831-32 (1994) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968)); *see also State v. Taylor*, 332 N.C. 372, 390, 420 S.E.2d 414, 424-25 (1992).

Defendant has failed to show any compelling reason why we should reexamine our holdings at this time. Thus, these assignments of error are overruled.

## GUILT-INNOCENCE PHASE ISSUES

**[22]** By another question presented, defendant contends that the trial court erred when it sustained an objection by the prosecutor with regard to a question asked by defendant to Detective Poplin on cross-examination. The exchange took place as follows:

Q. You described to Tony Watts the description that was then being used for the alleged assailant of Audrey Hall; is that correct?

A. That's correct.

Q. And was that person identified as having come by the house after Hall left?

[PROSECUTOR]: Objection.

THE COURT: Well, sustained. You don't have to answer.

Defendant did not make an offer of proof developing Detective Poplin's testimony. Thus, defendant has failed to properly preserve this issue for appellate review according to N.C.G.S. § 8C-1, Rule 103(a)(2) (2001); *see, e.g., Atkins*, 349 N.C. at 79, 505 S.E.2d at 108. Assuming *arguendo* that the substance of the testimony was "apparent from the context" in that Detective Poplin's answer to the question would have been "yes," the statement would still have been excluded as hearsay because it was being offered for the truth of the matter asserted, and defendant offered the trial court no exception to the rule in order to allow the statement to be admitted. *See* N.C.G.S.

§ 8C-1, Rules 801, 802 (2001). Therefore, defendant's assignment of error is overruled.

[23] Defendant next contends that the trial court erred by denying his objections and motions to strike the testimony of David Spittle concerning DNA profiles and his conclusions. David Spittle, a special agent with the North Carolina State Bureau of Investigation assigned to the forensic crime lab in Raleigh, was called as a witness by the State and accepted as an expert in forensic DNA analysis by the trial court. Agent Spittle conducted DNA analysis in the Audrey Hall case by using blood samples from defendant and blood samples and vaginal material from Hall. In his testimony, Agent Spittle stated:

> My conclusion is as follows, the DNA profile obtained from the male fraction of the vaginal swab item 5C has more than one contributor. Evidence of DNA carryover from the victim's profile was observed. Assuming a single semen donor, the DNA banding pattern is consistent with a mixture of the victim's[,] that would be Audrey Marie Hall[,] and [defendant's] DNA profile.

Defendant contends that this conclusion was based on the inaccurate premise that there was only one male donor of semen and that it is therefore, inadmissible. We disagree.

Throughout his testimony, Agent Spittle stated that the DNA banding pattern consisted of more than one contributor. As stated above, Agent Spittle concluded that the DNA banding pattern reflected a mixture of defendant's DNA and Hall's DNA. Defense counsel asked Agent Spittle on cross-examination whether it was possible that there could have been another male donor. Agent Spittle answered that there could have been more than one donor, but the donor "would have to have the same DNA profile or contain the same DNA results."

N.C.G.S. § 8C-1, Rule 702(a) provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702(a) (2001). DNA evidence is admissible in North Carolina, *State v. Pennington*, 327 N.C. 89, 100-101, 393 S.E.2d 847, 854 (1990), and Agent Spittle was giving his opinion of the test-

ing results based upon his expertise in the field of forensic DNA analysis. This opinion was not based upon an inaccurate premise, but rather upon Agent Spittle's analysis of the testing results and his experience in doing so. Furthermore, defendant was able to cross-examine Agent Spittle as to whether there was a possibility that there could have been another male donor. We also note that defendant did not specify the reasons for his objections to Agent Spittle's testimony with regard to this matter. Thus, we conclude that Agent Spittle's testimony was not based on an inaccurate premise and that the trial court did not err in overruling defendant's objections and motions to strike Agent Spittle's testimony concerning the DNA evidence.

[24] Next, defendant argues that the trial court erred by denying his objection to the State's introduction of still photographs of defendant that were obtained from a videotape made by the news media during a pretrial hearing. The State used the photographs to demonstrate the length of defendant's fingernails. The photographs were cropped in order to show defendant's fingernails and the side of his face. Defendant contends that the introduction of these photographs was in violation of Rule 15(i) of the General Rules of Practice for the Superior and District Court. Defendant also argues that these photographs were inadmissible under N.C.G.S. § 8C-1, Rules 401 and 403.

At the outset, we note that defendant made no argument at trial on the basis that the photographs were inadmissible under N.C.G.S. § 8C-1, Rules 401 and 403. Thus, defendant did not preserve these specific arguments for appellate review. N.C. R. App. P. 10(b)(1); *see also State v. Frye*, 341 N.C. 470, 495-96, 461 S.E.2d 664, 676-77 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

Rule 15(i) of the General Rules of Practice for the Superior and District Court provides:

> (i) *Impermissible Use of Media Material.* None of the film, video tape, still photographs or audio reproductions developed during or by virtue of coverage of a judicial proceeding shall be admissible as evidence in the proceeding out of which it arose, any proceeding subsequent and collateral thereto, or upon any retrial or appeal of such proceedings.

Gen. R. Pract. Super. and Dist. Ct. 15(i), 2002 Ann. R. N.C. 11, 14. As stated above, the State used the photographs to demonstrate the length of defendant's fingernails, and the photographs were cropped

in order to show only defendant's fingernails and the side of his face. Thus, even assuming *arguendo* that defendant is correct in his assertion that the trial court erred in admitting these photographs, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted these photographs. Therefore, this assignment of error is overruled.

[25] In defendant's next question presented, he contends that the trial court erred by denying his motion for an *in camera* inspection of certain records of the victims and by sustaining the State's objections to certain questions asked in regard to the Jacqueline Crump case.

With regard to the motion for an *in camera* inspection, defendant requested the trial court to issue an order

> requiring the Prosecutor, the Wake County Department of Social Services, Wake County Public Schools, Dorothea Dix Hospital, and any other agency of the State of North Carolina, the County of Wake, or any of its subdivisions, which have records relating to the alleged rape/sexual assault victims in this case, to produce those records in Court for an in camera inspection by the presiding Judge for which this case will be heard.

The trial court denied the motion as overly broad and gave defendant the opportunity to file a more specific motion if he chose to do so.

"A judge is required to order an *in camera* inspection and make findings of fact concerning the evidence at issue only if there is a possibility that such evidence might be material to guilt or punishment and favorable to the defense." *State v. Phillips*, 328 N.C. 1, 18, 399 S.E.2d 293, 301, *cert. denied*, 501 U.S. 1208, 115 L. Ed. 2d 977 (1991). Since there was no specific request made for evidence that is "obviously relevant, competent and not privileged," *State v. Hardy*, 293 N.C. 105, 127-28, 235 S.E.2d 828, 842 (1977), we hold that the trial court did not err in denying defendant's request for this *in camera* inspection.

We also note that defendant refers to a pretrial motion for discovery of medical records, and he claims that the trial court did not rule in a timely manner on this motion. However, defendant asked the court to hold the matter open until another motion was heard, which the court agreed to do, but defendant cites to nothing in the record

or transcript where he sought a ruling on this motion. Therefore, defendant has abandoned this issue. *See* N.C. R. App. P. 10(b)(1).

[26] As stated above, defendant also contends the trial court erred by sustaining the State's objections to certain questions asked by defendant in the Jacqueline Crump case. A nurse testified for the State about her emergency treatment of Crump. On cross-examination, defendant asked the nurse whether she remembered or acknowledged that a report written by a doctor also included a showing of a history of mental illness on the part of Crump. The State objected, and defendant made no offer of proof. A doctor also testified for the State as to his treatment of Crump in the emergency room. On cross-examination, defendant asked the doctor about the results of a urine and blood-alcohol screen on Crump and whether her record revealed a history of mental problems. Once again, the State objected, and defendant made no offer of proof.

We conclude that since defendant made no offer of proof as to the answers to these questions, he has failed to preserve any issue for appellate review according to N.C.G.S. § 8C-1, Rule 103(a)(2). *See, e.g., Atkins,* 349 N.C. at 79, 505 S.E.2d at 108. Assuming *arguendo* that the substance of the testimony was "apparent from the context," the statements would still have been excluded as hearsay because they were being offered for the truth of the matter asserted, and defendant offered the trial court no exception to the rule in order to allow the statements to be admitted. *See* N.C.G.S. § 8C-1, Rules 801, 802.

[27] Next, defendant contends that the trial court erred by allowing certain testimony to be introduced through Lisa Cozart over his objections. Cozart was called as a witness for the State during the Jacqueline Crump case. In 1995, Cozart was defendant's case manager for a program that helped homeless people find employment and housing. Cozart testified as to various aspects of her working relationship with defendant. The portion of Cozart's testimony to which defendant objected went as follows:

Q. And can you describe that discussion?

A. He was frustrated living at the AME shelter. He said that he had had some items stolen and was just frustrated and ready to leave there.

Q. Did you have a discussion with him at that time about his attitude?

A. I did. He was—in his frustration he was quite irritated, was a bit argumentative with me at that time and I basically told him that I would not allow him to remain in my office and speak that way and that he—

[DEFENSE COUNSEL]: Objection, motion to strike.

THE COURT: Motion denied.

Q. You can finish your answer.

A. I just told him that he would not be able to take his frustrations out on me.

[DEFENSE COUNSEL]: Objection, motion to strike.

THE COURT: Denied.

Defendant contends that it was error for the trial court to allow this testimony because it was not relevant under N.C.G.S. § 8C-1, Rule 401, and because the prejudicial effect of the testimony substantially outweighed its probative value under N.C.G.S. § 8C-1, Rule 403. We disagree.

Under N.C.G.S. § 8C-1, Rule 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Furthermore, this Court has previously stated as follows:

"Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."

*State v. Agee,* 326 N.C. 542, 548, 391 S.E.2d 171, 174-75 (1990) (quoting *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir. 1985)).

The State argues that in the entire context of Cozart's testimony, the discussion at issue was relevant. The testimony at issue developed naturally, helped the jury understand the working relationship between Cozart and defendant, and aided the jury in understanding defendant's background and his daily activities in Raleigh. The State further argues that Cozart's testimony was also relevant to show defendant's attitude towards women, which was a recurring theme

throughout the case. Thus, it is up to the jury to determine the proper weight that this testimony deserves.

However, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted this testimony. Therefore, this assignment of error is overruled.

[28] In defendant's next question presented before this Court, he contends that it was error for the trial court not to suppress the identification of defendant by Vicki Whitaker. Even assuming *arguendo* that the trial court did err in not suppressing Whitaker's identification of defendant, we hold that defendant was not prejudiced and has no basis for appeal on this issue since he was acquitted of the charges in the Whitaker case. Furthermore, defendant has made no argument that Whitaker's identification of defendant prejudiced his case against the other victims. Thus, this assignment of error has no merit.

[29] In defendant's next issue before this Court, he contends that the trial court erred in allowing a certain portion of Detective Turner's testimony, with regard to the Kimberly Warren case, to be admitted over his objection.

At trial, Warren testified that at some point during her struggle with defendant, she screamed, and then defendant ran away. The prosecutor asked Warren if she remembered which way defendant ran, and Warren responded, "No." Detective Turner testified with regard to the statement that Warren gave to her in order to corroborate Warren's testimony. Defendant assigns error to the following testimony by Turner that occurred on direct examination:

Q. Okay. I think you testified that she indicated she was able to scream?

A. Yes.

Q. What happened—what did she tell you happened after she screamed?

A. Well, she said she screamed and at that time he ran. And I asked her where he ran, and she—she really didn't know where he ran, but she assume[d] he ran back up the path that they came down.

[DEFENSE COUNSEL]: Objection.

A. That she saw him a few minutes later.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: Denied.

Defendant argues that this testimony violates N.C.G.S. § 8C-1, Rule 602 because Warren had no personal knowledge as to where defendant ran.

Defendant also assigns error to Turner's testimony with regard to a man named Jamal whom Warren had told about the incident with defendant. Turner testified on cross-examination as follows:

Q. And later in the interview you talked to her about Jamal. Right?

. . . .

A. Yes.

Q. And you asked her when she told Jamal?

A. Yes.

Q. And she told you she told Jamal maybe two days after it happened?

A. Right.

On redirect examination by the prosecutor, Turner testified in part as follows:

Q. Now, did she also tell you how Jamal acted when she told Jamal?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Yes. I asked her how did he act? Like he didn't care, or? And she finished by saying that he acted kind of nervous like, like he knew something about it but he didn't want to talk about it.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: Denied.

Defendant contends that this testimony violates N.C.G.S. § 8C-1, Rule 403.

We decline to address whether the trial court erred in allowing the above testimony to be admitted because even assuming *arguendo* that it was error for the trial court to admit this testimony, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted this testimony. Furthermore, with regard to the testimony by Detective Turner as to where Warren said defendant ran, the evidence showed that the police were able to capture defendant shortly thereafter. Therefore, any alleged prejudice from that testimony was nullified. Thus, the assignments of error under this issue are overruled.

[30] By another question presented, defendant contends that the trial court erred by overruling his objection to Detective Poplin's testimony when Poplin used the term "sexual assault" in his testimony with regard to the Shelly Jackson case. On direct examination by the State, Poplin testified, in part, as follows:

Q. Detective Poplin, as your investigation continued and you indicated you were involved in the Patricia Ashe case and you also became involved in the Audrey Hall case investigation, did you become involved in other investigations as well in which you saw similarities?

A. Yes, I did.

Q. And did you as part of your investigations and duties with the Raleigh Police Department at some later point become aware of the defendant John Williams Junior?

A. Yes, I did.

Q. And when was that?

A. On February the 4th, 1997 John Williams was arrested following attempted sexual assault of victim Shelly Jackson in the 600 block of West Hargett Street. The victim Shelly Jackson and the defendant were in the rear of a van in a furniture company lot.

[DEFENSE COUNSEL]: Move to strike the answer, specifically the use of the [term] sexual assault. It's conclusive.

THE COURT: Overruled.

Q. As part of your investigation, did you obtain a search warrant for the defendant's blood?

A. Yes, I did.

Q. And as part of . . . that investigation did you request that the DNA from the defendant be compared to the DNA from the victim in this case, Patricia Ashe?

A. Yes, I did.

Defendant argues that the use of the term "attempted sexual assault" by a law enforcement officer invaded the province of the jury and that the testimony was improper under N.C.G.S. § 8C-1, Rules 701 and 702.

Once again, even assuming *arguendo* that it was error for the trial court to admit this testimony, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted this testimony. Therefore, this assignment of error is overruled.

[31] In defendant's next question presented before this Court, he contends that the trial court erred by not excluding the testimony of Sylvia Wilson and Felicia Lawrence as improper Rule 404(b) evidence with regard to the Deborah Elliot case. The State sought to elicit testimony from Wilson and Lawrence pertaining to certain prior offenses committed against them by defendant in Augusta, Georgia. At a hearing to determine if Wilson and Lawrence would be allowed to testify, the trial judge ruled that the evidence of motive, plan, opportunity, intent, and *modus operandi* of these alleged offenses was so similar to the offenses for which defendant was charged that the testimony was admissible under Rule 404(b). The trial judge ruled that the evidence was admissible in the cases of all of the victims except Elliot. Defendant specifically argues that the trial court erred by not instructing the jury that the testimony of Wilson and Lawrence should not be used in determining defendant's guilt or innocence in the Elliot case. We disagree.

Investigator Mike Lantam of the Richmond County, Georgia, Sheriff's Department investigated the crime against Wilson in Augusta, Georgia. After Lantam testified, Wilson and Lawrence testified. After this testimony, the trial judge gave the following instruction to the jury:

Members of the jury, as it relates to the testimony, especially the last three witnesses concerning matters in the State of Georgia, any evidence of other crimes or wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. However, such evidence may be admissible to be considered by you as a jury for other purposes such as any proof of motive, opportunity, intent, preparation, plan, scheme, knowledge or identity, and for that purpose only.

Thereafter, the State began to present evidence in the Deborah Elliot case.

First, we conclude that this was a proper Rule 404(b) instruction, as it reads almost verbatim from the North Carolina Rules of Evidence. "If defendant desired a different, more limiting instruction, he should have requested it at that time." *State v. Hopper*, 292 N.C. 580, 589, 234 S.E.2d 580, 585 (1977). Also, the timing of this instruction leads this Court to conclude that the jury would have understood the instruction to apply to the previous cases for which evidence was already offered. Furthermore, defendant did not request that a limiting instruction be given to the jury for the Elliot case with regard to the Georgia evidence. This Court has previously stated that "[t]he admission of evidence, competent for a restricted purpose, will not be held error in the absence of a request by defendant for a limiting instruction. Such an instruction is not required to be given unless specifically requested by counsel." *Chandler*, 324 N.C. at 182, 376 S.E.2d at 735 (citation omitted). Therefore, we conclude that the trial court did not err by not instructing the jury that the testimony of Wilson and Lawrence should not be used in determining the guilt or innocence of Elliot. Thus, the assignments of error presented under this question presented are overruled.

[32] Next, defendant contends that the trial court erred by allowing Cynthia Pulley to testify about certain aspects of her relationship with defendant, as the trial court had already ruled similar testimony from another witness, Carolyn Barker, inadmissible. The trial court held a hearing in order to determine whether to admit the testimony of Pulley. The trial court concluded that the testimony of Pulley regarding choking and knife incidents was admissible under Rule 404(b), that alleged attacks on Pulley and Derrick Jackson were not too remote in time as to lose their relevance, and that an incident in which defendant allegedly forcibly stole Pulley's purse and for which defendant was arrested and incarcerated was admissible under Rule 404(b). Defendant argues that admitting this evidence was error

under Rule 404(b) in that the relationship between defendant and Pulley was so dissimilar to the crimes for which defendant was being tried that the evidence should have been deemed inadmissible. We disagree.

N.C.G.S. § 8C-1, Rule 404(b) reads in part as follows:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2001). Also, "[e]vidence of another offense or prior bad act 'is admissible so long as it is relevant to show any other fact or issue other than the character of the accused.'" *State v. Ratliff*, 341 N.C. 610, 618, 461 S.E.2d 325, 329-30 (1995) (quoting *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986)). This Court has further stated the following:

> Evidence of other crimes committed by a defendant may be admissible under Rule 404(b) if it establishes the chain of circumstances or context of the charged crime. Such evidence is admissible if the evidence of other crimes serves to enhance the natural development of the facts or is necessary to complete the story of the charged crime for the jury.

*State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 853 (citations omitted), *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

In the instant case, Pulley's testimony concerning the choking incidents between herself and defendant were admissible under Rule 404(b) in order to show motive, plan, common scheme, and intent, as the trial court found, since defendant had shown a pattern of choking his victims. *See, e.g., State v. Sexton*, 336 N.C. 321, 352-53, 444 S.E.2d 879, 897, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). Moreover, the relationship between defendant and Pulley and Jackson was relevant and admissible under Rule 404(b) as evidence of motive, since defendant had accused Pulley and Jackson of murdering Elliot. This relationship helped to prove the identity of defendant as the person who murdered Elliot. Ultimately, the evidence of this relationship and defendant's prior bad acts were so intertwined with the principal crime that it was properly admitted.

We also note that the fact that Carolyn Barker's proposed testimony was ruled inadmissible has no bearing on whether to admit the testimony of Pulley. The trial court's ruling on whether to admit Pulley's testimony was not dependent on his ruling on Barker's testimony. Thus, we conclude that the trial court did not err in admitting Pulley's testimony under Rule 404(b), and we therefore overrule these assignments of error with regard to this issue.

[33] In defendant's next issue before this Court, he contends that the trial court erred by allowing the jury to decide whether certain testimony from Detective Turner was admissible as corroborative evidence of Cynthia Pulley's testimony. Defendant argues that this was a question of law for the court to decide. On direct examination by the State, Turner testified in part as follows:

Q. Now, did you also again on that same page, did you also talk with [Pulley] about whether or not he would leave during the night; whether or not the defendant would leave her during night?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Offered for the purpose of corroborating the testimony of Ms. Pulley.

[DEFENSE COUNSEL]: Your Honor, I don't believe there was any such testimony.

THE COURT: It will be up to the jury to determine whether or not it corroborates. So, I'll allow her to testify.

A. When I was talking to her about that, she said that he would leave in the middle of the night and she didn't know where he would go, and that happened on a couple of occasions.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: Denied.

Defendant's contention is that the jury, in essence, was allowed to decide on the admissibility of this evidence. We disagree.

From reading the transcript, we conclude that the trial judge decided that this specific testimony from Turner was corroborative of Pulley's testimony, and therefore the testimony was admissible. The trial judge left it up to the jury to determine what corroborative effect the testimony would have. Furthermore, throughout the trial, the trial judge had given the jury limiting instructions on the use of corrobo-

rative evidence. Therefore, the jury was aware of what it meant for the judge to say that evidence was going to be admitted as corroborating evidence. Thus, we conclude that the trial judge, not the jury, decided on the admissibility of this evidence, and we therefore overrule this assignment of error.

We also note that defendant attempts to argue in his brief that this evidence was inadmissible under N.C.G.S. § 8C-1, Rule 608 and as inadmissible hearsay. However, defendant did not object on these grounds at trial. Thus, defendant did not preserve these specific arguments for appellate review. N.C. R. App. P. 10(b)(1); *see also Frye*, 341 N.C. at 495-96, 461 S.E.2d at 676-77.

**[34]** Defendant next argues that the trial court erred by allowing certain testimony by Detective William Medlin to be admitted as corroborative evidence of William Hargrove's testimony pertaining to the Deborah Elliot case. During Medlin's testimony, the prosecutor asked him about an interview that he had conducted with Hargrove. Hargrove was responsible for a van that belonged to the A.S.K., a store that was combined with a temporary employment agency. Hargrove would drive people to work in the van, and he lived in the van some of the time. Hargrove also used the van to make sexual arrangements between men and some of the women he knew. Defendant objected on the basis of hearsay to three different instances during Medlin's testimony. We will discuss each instance separately.

The first instance concerned Medlin's statement that Hargrove told Medlin that defendant knew Deborah Elliot, that Hargrove had seen defendant and Elliot speaking to each other, and that defendant had met Elliot through Hargrove. Defendant contends that this testimony by Medlin was hearsay and not corroborative of Hargrove's testimony.

The pertinent part of Hargrove's testimony was as follows:

Q. Ah, and when John would come down there, you and John would be hanging out together. You'd be drinking liquor, and smoking dope, and chasing women. Right?

A. Yes.

Q. Okay. And you would carry John around, and you and he would sort of go out together?

A. Yes.

Q. And so a lot of times you were with John when he was with women and having sex with women. Isn't that true?

A. In a way of speaking, yes.

Q. All right. You never saw John get violent or ugly with a woman, did you?

A. No. Not in my presence, no.

Q. Jean Elliot was a friend of [y]ours, but you never saw John with Ms. Elliot?

A. No.

Hargrove used his van at times to arrange meetings between prostitutes and their customers. Hargrove also admitted to arranging women for defendant on various occasions and also at times being present when defendant was having sex with these women. Thus, taken in context, Hargrove's testimony about not seeing defendant and Elliot together could be construed as Hargrove not seeing defendant and Elliot together in a sexual manner. Therefore, Medlin's testimony would not contradict Hargrove's testimony.

> In order to be admissible as corroborative evidence, a witness's prior consistent statements merely must tend to add weight or credibility to the witness's testimony. Further, it is well established that such corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates.

*State v. Farmer*, 333 N.C. 172, 192, 424 S.E.2d 120, 131 (1993) (citation omitted). Furthermore, the trial judge is in the best position to rule on such an issue, and he determined that Medlin's testimony corroborated the testimony of Hargrove. Thus, we conclude that the trial court did not err in ruling that Medlin's testimony corroborated Hargrove's testimony and that the weight to be given to such corroboration was for the jury to decide.

The second instance to which defendant objected concerned whether Hargrove told Medlin that defendant usually carried a box cutter. Hargrove had previously testified that he did not know whether defendant carried a knife or any other kind of weapon. However, Medlin testified that Hargrove had told him that defendant "usually carried a regular box cutter." Defendant contends

that Medlin's testimony contradicts Hargrove's testimony, and therefore, it cannot be admitted for purposes of corroboration.

Even assuming *arguendo* that it was error for the trial court to admit this testimony as corroboration, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted this testimony. Sylvia Wilson and Audrey Hall testified that defendant had a box cutter. Kimberly Warren testified that defendant had a sharp object in his hand. Shirley Jackson thought defendant had a razor in his hand, and the police seized a box cutter from defendant shortly after his assault on Jackson. Plus, Deborah Elliot's bra had been cut apart. Thus, Medlin's testimony was not necessary to prove to the jury that defendant used a box cutter to assault his victims.

The third instance to which defendant objected involves a mistake Medlin made in repeating what Hargrove had told him. The pertinent part of Medlin's testimony went as follows:

Q. Now, with regard to Kimberly Warren, did Mr. Hargrove indicate to you that he knew an individual by that name?

. . . .

A. He did not give a last name at the time. No, ma'am; just that he knew a female by the first name of Kim.

Q. And directing your attention to page thirty-two of your interview, did you have a conversation with Mr. Hargrove about this individual named Kim?

[DEFENSE COUNSEL]: Objection, hearsay.

THE COURT: Overruled.

A. Yes, ma'am.

Q. And what did he tell you about Kim?

[DEFENSE COUNSEL]: Objection, hearsay.

THE COURT: Overruled.

A. He stated that Ms. Warren stated that the defendant was trying to make her take her clothes off; said he tried to cut her throat, and she threw her arms. That he cut her on the arm or hand. Said she kicked him in the—his statement were—was

"balls." He stated, "I don't know anything other than that." I'm sorry. That's actually from previous cases discussed in here.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: Overruled.

Q. Now, with regard to Kim Warren, what did he tell you about Kim?

A. It's actually on page thirty-four of the interview. He stated—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. He stated that Ms. Warren "told me about that he had tried to make her—make her give him some head and she got away from him."

Q. Did he tell you anything—did he tell you anything about a weapon, or anything involved in that?

[DEFENSE COUNSEL]: Objection, hearsay.

THE COURT: Overruled.

A. Yes, ma'am.

Q. And what did he tell you about that?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. That Ms. Warren told him that he, he being the defendant, put a knife to her throat and tried to make her give him head.

Defendant argues that the testimony regarding Medlin describing an event which actually pertained to another case was "Unidentifiable Hearsay Testimony" and was therefore inadmissible. However, we conclude that this statement by Medlin was an honest mistake that was immediately corrected. Medlin was referred by the prosecutor to the wrong page of his interview with Hargrove. Once Medlin realized the mistake, he quickly turned to the correct page and continued his testimony. Defendant has given us no reason to believe that this mistake constituted prejudicial error and that a different result would have been reached at trial had the trial court not admitted this testimony. See N.C.G.S. § 15A-1443(a). Thus, even if there was error on the part of the trial court, we conclude that it was not prejudicial.

For the reasons stated above regarding the three instances of Medlin's testimony to which defendant objected, we find no error, and we therefore overrule this assignment of error.

[35] By another question presented, defendant contends that the trial court erred by overruling his objections and motions to strike certain testimony by Gloria Anderson with regard to the Deborah Elliot case. Anderson's testimony related to her seeing defendant on 24 December 1996 between 9:00 a.m. and 10:00 a.m., after defendant had been released from jail for taking Cynthia Pulley's purse. Anderson's relevant testimony was as follows:

Q. How did the defendant act when he came up to you?

[DEFENSE COUNSEL]: Object.

A. He acted real strange. He acted like he had seen a ghost or something. I mean, he was just weird. He was upset. He wanted to see Cynthia about a pocketbook or something, something about the pocketbook.

[DEFENSE COUNSEL]: Objection, motion to strike.

THE COURT: Overruled.

Q. Did he say anything about Cynthia at the time?

A. He said he was going to kill her if he saw her.

[DEFENSE COUNSEL]: Object, motion to strike.

THE COURT: Overruled.

Q. Did you hear him say that?

A. Yes, I did.

Q. And what did you say in response to that?

A. Me and my friend-girl told him don't do that.

Defendant argues that this testimony was irrelevant under N.C.G.S. § 8C-1, Rule 401; that the testimony was prejudicial under N.C.G.S. § 8C-1, Rule 403; and that the testimony was inadmissible hearsay.

However, considering the overwhelming evidence against defendant with regard to the Elliot case, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached

at trial had the trial court not admitted this testimony. Therefore, this assignment of error is overruled.

[36] Defendant's next question presented before this Court pertains to certain testimony from Detectives Poplin and Turner concerning defendant's demeanor towards Turner, who is a female, during their interview of defendant on 25 February 1997. Defendant contends that the testimony was irrelevant. We disagree.

The relevant portion of Detective Poplin's testimony on direct examination was as follows:

Q. Detective Poplin, during the course of this interview, you were asking the defendant some questions at some points during the interview, and Detective Turner, you indicated, was also present. She asked the defendant some questions during the interview?

A. Yes.

Q. And during the course of the time that you spent with the defendant, did you notice any change in his demeanor between the times that you would ask him a question and the time that Detective Turner would ask him a question?

[DEFENSE COUNSEL]: Object.

THE COURT: Overruled.

A. Initially, he was more polite to me, he would answer my questions, but when she asked questions, he seemed more hostile and would give shorter, quicker answers. He didn't seem to really like to speak with her. Later in the interview, he was doing the same with me as well, but initially he was more, I guess the term would be friendly towards me.

[DEFENSE COUNSEL]: Move to strike.

THE COURT: Denied.

As to defendant's objection to Detective Turner's testimony, the following colloquy ensued between the prosecutor and Turner on direct examination:

Q. Now with regard to that particular interview that you did with the defendant on February 25th of 1997, did you speak with the defendant during that period of time as well?

A. Yes.

Q. What was his demeanor like with you, Detective Turner?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Well, he—it appeared that he was short with me, and when I looked directly at John to ask him a question he would not look at me with the answer. He would look at Detective Poplin.

[DEFENSE COUNSEL]: Motion to strike.

THE COURT: Denied.

Q. Did he treat you different than he treated Detective Poplin?

[DEFENSE COUNSEL]: Objection; speculation.

THE COURT: Overruled.

A. Yes.

Q. And how was that?

A. He was short with his answers, and just looked at Detective Poplin instead of me while talking.

We conclude that the foregoing testimony had no impact on the case considering the overwhelming evidence against defendant. Therefore, once again, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not admitted this testimony. Therefore, the assignments of error under this issue are overruled.

[37] Next, defendant argues that the trial court erred by admitting certain testimony by Detective Turner regarding her observation of defendant's reaction upon his seeing Audrey Hall enter the courtroom. During jury selection, Turner had entered the courtroom at the same time as Audrey Hall. On direct examination, the prosecutor questioned Turner about that incident as follows:

Q. Were you in a position to observe the defendant's demeanor when Ms. Hall came into the courtroom?

A. Yes.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. What was his demeanor and actions when Ms. Hall came into the courtroom?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Well, Ms. Hall came out of that door first, then Ms. Scott, and then I was last, and she went into the back to sit down about three or four rows back, and I came to the front so I was heading towards the front, and I noticed that the defendant, John Williams, had a very strong reaction whenever he looked back and saw her.

[DEFENSE COUNSEL]: Objection. Motion to strike.

THE COURT: Overruled.

A. He, ah—

Q. What was that reaction?

A. He looked at her, and he turned around and he looked at her again, and he spoke to his attorney . . . and pointed his finger back like that (indicating), and I thought that was very strange because during the interview that I was with Detective Poplin in the interview of the defendant, John Williams, he said he didn't know her.

Defendant contends that this testimony was speculative and inadmissible. We disagree.

N.C.G.S. § 8C-1, Rule 701 provides as follows:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2001). Defendant had previously stated to Detectives Poplin and Turner that he did not know Hall, even though other evidence was introduced to the contrary. Thus, Turner's testimony as to defendant's conduct towards Hall was a reasonable inference that was rationally based on Turner's perception and it helped to

refute defendant's statement that he did not know Audrey Hall. It is for the jury to determine the proper weight to give to this evidence. Therefore, we conclude that this evidence was relevant and admissible, and we overrule this assignment of error.

**[38]** Defendant next contends that the trial court erred in the Deborah Elliot case by admitting into evidence two exhibits that were used during the interview of defendant on 25 February 1997. The exhibits consisted of a diagram and some photographs. Defendant used the diagram and photographs when giving his statement on 25 February 1997. Defendant did not object to the introduction of these exhibits, but he did object to Detective Poplin's testimony in relation to what defendant said regarding the exhibits during the interview. We have previously determined in this opinion that defendant's statement on 25 February 1997 was admissible. The exhibits were a part of that statement, and defendant has not given us any reason to reconsider our decision on that issue. Thus, the assignments of error presented under this issue are overruled.

**[39]** In defendant's next issue before this Court, he contends that the trial court erred in the Deborah Elliot case during the jury view of the crime scene by not permitting defendant to raise a bay roll-up door at the old Pine State building. Defendant, in his statement to Detectives Poplin and Turner on 25 February 1997, said that he witnessed Elliot being murdered while he was looking under the roll-up door at the old Pine State building. Defendant said that the door had been raised approximately eighteen inches. Detective Poplin testified that he returned to the scene and raised the roll-up door approximately eighteen to twenty inches and that he could see into the area only two or three feet. A jury view of the crime scene at the old Pine State building was held on 19 February 1998. At the jury view, the trial judge reiterated his ruling not to allow defendant to conduct any demonstrations with regard to the roll-up door because the circumstances at the time of the jury view were not the same as at the time of the offense. For the reasons set forth below, we agree with the trial court's decision.

"The test for admissibility of evidence regarding a demonstration is whether, if relevant, the probative value of the evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.'" *Golphin*, 352 N.C. at 434, 533 S.E.2d at 215 (quoting *State v. Allen*, 323 N.C. 208, 225, 372 S.E.2d 855, 865 (1988), *sentence vacated on other grounds*, 494 U.S. 1021,

108 L. Ed. 2d 601 (1990)). Furthermore, "[t]he determination of whether relevant evidence should be excluded pursuant to Rule 403 'is a matter left to the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion.' " *Id.* (quoting *Wallace*, 351 N.C. at 523, 528 S.E.2d at 352-53). We find no evidence, and defendant has provided no argument, that the trial court abused its discretion in determining that a demonstration was inappropriate because of changed circumstances. The trial judge is in the best position to make the ruling, and we find no reason to overrule his decision. Moreover, defendant has given us no reason to believe that even if it was error not to allow the demonstration, a different result would have been reached at trial had the trial court not committed this error. *See* N.C.G.S. § 15A-1443(a). Therefore, this assignment of error is overruled.

**[40]** Defendant's next contention is that the trial court erred by allowing Gustavo Medina to testify concerning statements he overheard defendant make while in jail. Medina was serving a sixty-day sentence for DWI in the Wake County jail. The trial court conducted a hearing before Medina testified in order to determine the admissibility of his testimony. The trial court determined that some of Medina's proffered testimony was admissible under N.C.G.S. § 8C-1, Rules 404(b) and 801(d). At trial, Medina testified as follows:

Q. Okay. So you could hear what they were saying?

A. Yeah.

Q. Could you see them talking, too?

A. Yeah. He was talking.

Q. Okay. What was he talking about?

A. About the girls killed.

Q. I'm sorry?

A. About the girls killed.

Q. Okay—

   [DEFENSE COUNSEL]: Objection. Motion to strike.

   THE COURT: Overruled.

Q. And what did he say about the girls that got killed?

A. It was him; that he did it.

Q. Did you see him say that he did it?

A. Yes.

Q. Did you hear him say that he did it?

A. Yes.

Q. Did you know him at the time?

A. I recognize him, his face. It was in the newspaper.

Defendant argues that this testimony was inadmissible under N.C.G.S. § 8C-1, Rules 404(b) and 801(d). For the reasons discussed below, we conclude that this testimony was admissible under Rule 801(d), and therefore, we decline to address defendant's argument under Rule 404(b).

N.C.G.S. § 8C-1, Rule 801(d) reads, in pertinent part, that "[a] statement is admissible as an exception to the hearsay rule if it is offered against a party and it is . . . his own statement, in either his individual or a representative capacity." N.C.G.S. § 8C-1, Rule 801(d)(a). Further, "[a]n admission is a statement of pertinent facts which, in light of other evidence, is incriminating." *State v. Trexler*, 316 N.C. 528, 531, 342 S.E.2d 878, 879-80 (1986).

The trial court found as fact that "Mr. Medina heard the defendant make some incriminating statements with regard to the defendant's involvement in the murders for which he is currently on trial." The trial court also found that "Mr. Medina heard and saw the defendant tell other inmates that 'I killed those girls and two more in Georgia.'" These findings of fact plus Medina's testimony regarding what he heard defendant say lead us to conclude that Medina's testimony was admissible as an admission by defendant under N.C.G.S. § 8C-1, Rule 801(d)(A).

[41] Next, defendant contends that the trial court erred by admitting into evidence videotapes and photographs that showed crime scenes and injuries with respect to Audrey Hall, Jacqueline Crump, Patricia Ashe, Sylvia Wilson, and Deborah Elliot. Defendant argues that the introduction of this evidence was inadmissible under N.C.G.S. § 8C-1, Rules 401 and 403. We disagree, and we will address each instance of alleged error with respect to each person listed above.

With regard to Audrey Hall, the trial court admitted exhibits AH-1 through AH-6, which included photographs of Hall. Defendant

contends that he objected to the introduction of these photographs. However, the State introduced these exhibits to illustrate Hall's testimony, and defendant did not object to the introduction of these exhibits at that time. Later in the trial, the State used these exhibits to illustrate Detective Poplin's testimony. A visual presenter was also set up in order to aid the testimony. At that time, defendant objected to the introduction of these photographs and "specifically renew[ed] the objection to the [specific] photo" that was being shown on the visual presenter. Defendant also reiterated that he specifically renewed his objection to all of the exhibits.

Defendant was mistaken in the belief that he had previously objected to the introduction of these exhibits. Since defendant did not object to the introduction of these exhibits during Hall's testimony, he has lost the benefit of his objection to these exhibits at this time, and he has failed to properly preserve this argument for appeal. See N.C.G.S. § 8C-1, Rule 103(a)(1); N.C. R. App. P. 10(b)(1). Even if defendant had objected, we conclude that these exhibits were not so cumulative in nature as to constitute undue prejudice. Thus, this assignment of error is overruled.

As to Jacqueline Crump, defendant contends that the trial court erred by allowing the State to introduce photographs that repeatedly showed the bloody wall of the tunnel and Crump's injuries. First, defendant cites no transcript reference that refers to the State's introduction of any photographs depicting Crump's injuries, and the State contends that it never introduced any photographs depicting Crump. Thus, the only photographs in issue are those of the crime scene.

At trial, when the State moved to introduce exhibits JC-4 through JC-15, which depicted the crime scene in the Crump case, defendant just said, "Objection." The trial court admitted the exhibits for the purpose of illustrating the testimony of City-County Bureau of Identification Agent Harley Frame, who took the photographs on 26 October 1995.

A general objection, when overruled, is ordinarily not adequate unless the evidence, considered as a whole, makes it clear that there is no purpose to be served from admitting the evidence. Counsel claiming error has the duty of showing not only that the ruling was incorrect, but must also provide the trial court with a specific and timely opportunity to rule correctly.

*State v. Jones*, 342 N.C. 523, 535-36, 467 S.E.2d 12, 20 (1996) (citation omitted); *see also* N.C.G.S. § 8C-1, Rule 103(a)(1). We conclude that defendant's general objection to these exhibits was not adequate to preserve this assignment of error properly for appellate review. Therefore, this assignment of error is overruled.

With regard to the Patricia Ashe case, the exhibits included a videotape of the crime scene, photographs taken during the autopsy, and photographs of Ashe's body at the crime scene. At trial, defendant did not object to the admission of the photographs of Ashe's body at the crime scene, and he did not assign error to the admission of the photographs. Thus, the crime scene photographs are not in issue. *See* N.C. R. App. P. 10(c)(1); N.C. R. App. P. 28(b)(6).

Defendant contends that the videotape focused the jury on Ashe's body and that the autopsy photographs were repetitive. Defendant provides no other support for his argument except to make this blanket statement. We find nothing in the record or transcripts to conclude that the videotape or photographs were repetitive or that the trial court abused its discretion by allowing these exhibits to be admitted. Furthermore, defendant has not carried his burden by showing that even if it was error for the trial court to admit these exhibits, a different result would have been reached at trial had the trial court not committed this error. *See* N.C.G.S. § 15A-1443(a). Thus, these assignments of error are overruled with regard to this question presented.

Next, with regard to Sylvia Wilson, defendant argues that Investigator Lantam was shown a series of photographs of the crime scene and of Wilson's injuries. Defendant also contends that Lantam admitted that two of the exhibits were basically the same. Once again, defendant provides no argument in support of his contentions. Furthermore, we conclude that the photographs were not too gruesome or repetitive and cumulative as to violate N.C.G.S. § 8C-1, Rule 403. Therefore, this assignment of error is overruled.

Finally, as to Deborah Elliot, the State introduced exhibits consisting of eleven photographs taken at the crime scene, three photographs taken at Elliot's autopsy, and a videotape of the crime scene and Elliot's body at the Wake Medical Center morgue. Defendant argues that these exhibits were gruesome and repetitive and were thus inadmissible. We disagree.

"As a general rule, gory or gruesome photographs have been held admissible so long as they are used for illustrative purposes and are

not introduced solely to arouse the passions of the jury." *Warren*, 348 N.C. at 110, 499 S.E.2d at 448. Also, "[p]hotographs depicting '[t]he condition of the victim's body, the nature of the wounds, and evidence that the murder was done in a brutal fashion [provide the] circumstances from which premeditation and deliberation can be inferred.'" *State v. Hyde*, 352 N.C. 37, 54, 530 S.E.2d 281, 293 (2000) (quoting *Warren*, 348 N.C. at 111, 499 S.E.2d at 448), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). Furthermore, this Court has previously stated the following:

> Photographs "showing the condition of the body when found, its location . . . , and the surrounding scene at the time . . . are not rendered incompetent by the portrayal of the gruesome events which the witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982). Repetitive photographs may be introduced, even if they are revolting, as long as they are used for illustrative purposes and are not aimed solely at prejudicing or arousing the passions of the jury.

*State v. Peterson*, 337 N.C. 384, 393-94, 446 S.E.2d 43, 49 (1994). The same principles that apply to the admissibility of photographs apply to the admissibility of videotapes. *Blakeney*, 352 N.C. at 310, 531 S.E.2d at 816.

After reviewing the record and the exhibits, we conclude that the photographs and videotape submitted in the Elliot case were not so gruesome and repetitive as to require their inadmissibility. Applying the above principles and the requirements of N.C.G.S. § 8C-1, Rule 403, we also conclude that the trial court properly admitted this evidence. Therefore, these assignments of error are overruled as they pertain to this issue.

**[42]** Defendant next argues that the trial court erred by denying his motion to dismiss the murder and rape charges in the Patricia Ashe case at the end of the State's evidence and at the end of all of the evidence based on the insufficiency of the evidence. We disagree. The jury convicted defendant of first-degree murder based on premeditation and deliberation and based upon the felony murder rule, with rape as the underlying felony. The jury also convicted defendant of first-degree rape in the Ashe case.

The question that must be answered when presented with a motion to dismiss a charge at the close of all the evidence is

whether, upon consideration of all the evidence in the light most favorable to the State, there is substantial evidence that the crime charged in the bill of indictment was committed and that defendant was the perpetrator. Substantial evidence is that amount of "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995).

*State v. Armstrong*, 345 N.C. 161, 164-65, 478 S.E.2d 194, 196 (1996) (citation omitted). "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988). In order to overcome a motion to dismiss, the evidence does not have to rule out every hypothesis of innocence. *See Golphin*, 352 N.C. at 458, 533 S.E.2d at 229. Furthermore, "contradictions and inconsistencies do not warrant dismissal; the trial court is not to be concerned with the weight of the evidence. Ultimately, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *State v. Lee*, 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998) (citation omitted).

When viewing all of the evidence in the light most favorable to the State, we conclude that the trial court did not err in denying defendant's motion to dismiss the murder and rape charges in the Ashe case. The evidence at trial tended to show that DNA testing was conducted on vaginal swabs taken from Ashe and that a DNA match was found with defendant. Also, the doctor who performed the autopsy on Ashe's body concluded that Ashe died as a result of strangulation. Scrapes and scratches were found on both sides of Ashe's neck as well as on the front of her neck. Although the sexual encounter may have been voluntary in the beginning, the evidence indicates that at some point it turned involuntary as testified to by Dr. John Butts, who stated that the multiple scratches and scrapes on Ashe's neck are signs indicative of someone struggling. Furthermore, the Rule 404(b) evidence presented at trial showed that defendant would consistently choke his victims while raping or assaulting them, which would be consistent with the evidence in the Ashe case.

Other evidence at trial showed that there was evidence of crack cocaine use at the scene of the crime that was consistent with defendant's *modus operandi* of inducing women to go with him in

order to consume crack. Moreover, defendant denied to Detectives Poplin and Turner that he knew Patricia Ashe, but the DNA evidence refutes this statement. Finally, defendant's statement, overheard by Gustavo Medina, that he killed those girls provides further evidence in order to survive a motion to dismiss. Overall, the evidence presented in this case considered in the light most favorable to the State could permit a jury to find that these crimes were committed against Ashe and that defendant was the perpetrator of these crimes. Therefore, this assignment of error is overruled.

[43] Defendant also argues that it was error to submit as an aggravating circumstance N.C.G.S. § 15A-2000(e)(5), which provides that "[t]he capital felony was committed while the defendant was engaged . . . in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any . . . rape or a sex offense." However, we have found no instance where defendant objected to the submission of this aggravating circumstance at trial, and defendant has cited no transcript page in which he objected to the submission of this aggravating circumstance. Thus, defendant has failed to properly preserve this alleged error and has therefore waived appellate review of this issue. *See* N.C. R. App. P. 10(b)(1); *Thomas*, 350 N.C. at 363, 514 S.E.2d at 515. Accordingly, this assignment of error is overruled.

[44] Defendant next contends that the trial court erred by denying his motion to dismiss the murder charge in the Deborah Elliot case, both at the end of the State's evidence and at the end of all of the evidence, based on the insufficiency of the evidence. The jury convicted defendant of first-degree murder of Elliot based upon premeditation and deliberation and under the felony murder rule with attempted rape as the underlying felony. Specifically, defendant argues that the evidence was insufficient in order to determine that defendant was the perpetrator of the murder and that the evidence was insufficient in order to determine that defendant attempted to rape Elliot. We disagree and will discuss each argument separately.

As to the sufficiency of the evidence that defendant was the perpetrator of the Elliot murder, there was enough evidence to submit the charge to the jury. As previously stated, Elliot's body was found in a building that was formerly part of the Pine State Creamery. Defendant was familiar with this area because he had stayed there three weeks earlier with Cynthia Pulley. Shoe tracks inside the dispatcher's shack were determined to be consistent with the soles of

Elliot's shoes. Defendant's shoe print was also found inside the shack. It was also determined that the shoe print was fresh since the area was very dusty, and dust had not yet covered the shoe print. Also, defendant told Detectives Poplin and Turner through his statement of 25 February 1997 that he had witnessed Elliot's murder by looking into the bay area of the building through a gap in a roll-up door. Detective Poplin testified that he attempted to look into the bay area through the roll-up door, with the door lifted up to about the size that defendant said the door was open, and he determined that it was not possible to see the events that defendant described. Defendant told the detectives where the murder took place, the nature of the weapon, and the nature of the blows. Defendant had also lied to Detective Curtis Womble and Officer A.S. Odette as to when he had last seen Elliot.

Furthermore, Elliot had been choked, and the scratches on her neck were consistent with the marks that defendant had left on his other victims. Also, the crime scene was close to the house where defendant had stayed with Cynthia Pulley and was about four blocks from the location where the attacks on Kimberly Warren and Shelly Jackson took place. On a final note, Gustavo Medina, while in the Wake County jail, overheard defendant say that he had killed those girls.

Overall, the evidence presented in this case, considered in the light most favorable to the State, could permit a jury to find that defendant was the perpetrator of the murder of Deborah Elliot. Thus, the trial court did not err in denying defendant's motions to dismiss, thereby allowing the jury to decide whether defendant was the perpetrator of the Elliot murder.

**[45]** Next, as to the sufficiency of the evidence that defendant attempted to rape Elliot, which evidence was the basis for the felony murder conviction, we conclude that the evidence was sufficient to survive defendant's motions to dismiss.

"The elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996). First, Elliot's body was found naked except for her shoes and socks. Elliot's bra had been cut apart, and a couple of buttons appeared to have been torn off of her shirt. Rule 404(b) evidence tended to show that defendant lured his victims to isolated

locations where he would assault them in part by choking them while raping or attempting to rape them. The evidence showed that Elliot was choked, which was consistent with some of defendant's other victims. Considering all of this evidence in the light most favorable to the State, we conclude that a reasonable inference could be made that defendant attempted to rape Elliot. Therefore, the trial court did not err by permitting the jury to find that defendant attempted to rape Elliot.

[46] Once again, defendant argues that the trial court erred by submitting N.C.G.S. § 15A-2000(e)(5) as an aggravating circumstance. As stated previously, we have found no instance where defendant objected to the submission of this aggravating circumstance at trial, and defendant has cited no transcript page in which he objected to the submission of this aggravating circumstance. Thus, defendant has failed to properly preserve this alleged error and has therefore waived appellate review of this issue. *See* N.C. R. App. P. 10(b)(1); *Thomas*, 350 N.C. at 363, 514 S.E.2d at 515. Therefore, this assignment of error is overruled.

[47] In defendant's next question presented, he argues that the trial court erred by not giving the jury an alibi instruction with respect to the Audrey Hall case.

During the charge conference at the guilt-innocence phase of the trial, the judge asked the parties for any specific instructions that they would like the judge to consider. With respect to an alibi instruction, defendant just responded "301.10, alibi." The State objected to the alibi instruction on the basis that there was no evidence to warrant the instruction. Defendant responded by arguing that there was evidence that defendant had an alibi for the Deborah Elliot case, but defendant did not make an argument for an alibi instruction with regard to the other victims. The judge ultimately gave the jury an alibi instruction only for the Elliot case. At the end of the jury charge, defendant objected to the alibi instruction being limited to just the Elliot case. The judge responded that he gave the instruction that defendant requested. Defendant then argued that there was evidence to support the instruction in the Audrey Hall case. For the reasons discussed below, defendant failed to properly request the alibi instruction with regard to the Audrey Hall case.

"[S]ince the decision in *State v. Hunt*, 283 N.C. 617, 197 S.E.2d 513 (1973), the trial judge is not required to instruct on alibi unless defendant specifically requests such instruction." *State v. Waddell*,

289 N.C. 19, 33, 220 S.E.2d 293, 303 (1975) (citation altered), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). In this case, defendant did not request an alibi instruction for the Audrey Hall case until after the jury charge. Defendant's request was with regard only to the Deborah Elliot case. Furthermore, the evidence in the Hall case was insufficient to support an alibi instruction. The only evidence suggesting alibi was on cross-examination of Cynthia Pulley when she stated that she could not recall when in May 1996 defendant had left for his trip to Augusta, Georgia. This does not constitute enough evidence to support an alibi instruction. Thus, defendant did not properly request the alibi instruction, nor did the evidence support the instruction. Therefore, this assignment of error is overruled.

[48] In defendant's next question presented, he argues that the trial court erred by giving a general flight instruction and a flight instruction with regard to first-degree murder cases. The State requested the instructions, to which defendant objected, but defendant eventually conceded that the instruction was appropriate in the Shelly Jackson case. The trial court ultimately gave the following instruction to the jury with regard to flight:

> The State contends and the defendant denies that the defendant, Mr. Williams, fled at the time of these alleged offenses. Evidence of flight may be considered by you, together with all other facts and circumstances in this case, in determining whether the combined circumstances amount to an admission or show of a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt of any crime.

> Further, this circumstance has no bearing on the question of whether the defendant acted with premeditation and deliberation in the two murder charges. Therefore, it must not be considered by you as evidence of premeditation or deliberation in those two cases.

Defendant argues that the evidence did not support this instruction in any case except the Jackson case. We will not address the instruction with regard to the Jackson case because defendant conceded that the instruction in that case was correct, and we will also not address the instruction with regard to the Vicki Whitaker case because defendant was acquitted in that case.

We first note that defendant has provided virtually no factual support in his brief for his argument that the flight instruction was not supported by the evidence. In *State v. Steen*, 352 N.C. 227, 264, 536 S.E.2d 1, 23 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001), this Court determined that the defendant abandoned his assignment of error because he did not specifically assess the evidence or make an argument with cited authorities, and therefore, the assignment of error was not presented in a way for this Court to give it meaningful review. *See also* N.C. R. App. P. 28(a), (b)(5). However, even assuming *arguendo* that the flight instruction was improper as to the other victims, we hold that defendant has failed to show prejudice as required by N.C.G.S. § 15A-1443(a), and we cannot conclude that a different result would have been reached at trial had the trial court not given this instruction. Accordingly, this assignment of error is overruled.

## SENTENCING ISSUES

**[49]** Next, defendant contends that the trial court committed plain error at the capital sentencing proceeding by instructing the jury on the mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(1) and thereby allowing the State to introduce evidence of prior incidents committed by defendant that were "irrelevant and grossly prejudicial." We disagree.

As defendant concedes, since he did not object to this mitigating circumstance being admitted at the time (he actually considered requesting it himself at one point), we must review this issue under a plain error analysis to determine whether defendant is entitled to a new capital sentencing proceeding. *See* N.C. R. App. P. 10(c)(4).

[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir. 1982) (footnotes omitted), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Thus, in our review of the record for plain error, we must determine whether the submission of the (f)(1) mitigator and the subsequent rebuttal evidence by the State "was so egregious and prejudicial that defendant was not able to receive a fair sentencing proceeding as a result of the trial court's decision." *State v. Lemons,* 352 N.C. 87, 97, 530 S.E.2d 542, 548 (2000), *cert. denied,* 531 U.S. 1091, 148 L. Ed. 2d 698 (2001). After reviewing the whole record, we find no plain error.

N.C.G.S. § 15A-2000(f)(1) reads: "The defendant has no significant history of prior criminal activity." In response to the (f)(1) mitigator, the rebuttal evidence by the State included the following: (1) a forgery conviction from the State of Georgia; (2) misdemeanor convictions for simple battery and simple assault against Carolyn Barker and criminal trespass against the property of Rusty Griffin, all of which occurred in Georgia; (3) information dealing with a probation violation based on a shoplifting charge and having contact with Carolyn Barker; (4) the charges stemming from the assault on Sylvia Wilson in Georgia, to which Wilson had already testified during the trial; (5) a misdemeanor charge of harassing phone calls to Carolyn Barker; (6) a simple battery charge involving Carolyn Barker; (7) an indictment for burglary against Gwendolyn Smoot, which was reduced to criminal trespass; and (8) a charge of motor vehicle theft, which was not pursued because defendant was being charged for an offense in another county.

The jury had just found defendant guilty of the first-degree murder of Deborah Elliot, the first-degree murder of Patricia Ashe, the first-degree rape of Patricia Ashe, the first-degree rape of Audrey Hall, the first-degree sexual offense of Audrey Hall, the assault with a deadly weapon with intent to kill inflicting serious injury on Audrey Hall, the first-degree rape of Jacqueline Crump, the assault with a deadly weapon with intent to kill inflicting serious injury on Jacqueline Crump, the attempted first-degree rape of Shelly Jackson, the assault with a deadly weapon with intent to kill on Shelly Jackson, and the assault with a deadly weapon of Kimberly Warren. Based on these findings by the jury, we conclude that any alleged error by the trial court in allowing the (f)(1) mitigator to be introduced and thereby allowing the State's rebuttal evidence was not "so egregious and prejudicial that defendant was not able to receive a

fair sentencing proceeding as a result of the trial court's decision," and therefore it did not rise to the level of plain error. *Lemons*, 352 N.C. at 97, 530 S.E.2d at 548. Accordingly, this assignment of error is overruled.

[50] Defendant next argues that his execution would violate provisions of the International Covenant on Civil and Political Rights, which this country ratified on 8 September 1992. Specifically, defendant argues that the long delays between sentencing and execution and the conditions in which death row inmates are kept constitute "cruel, inhuman or degrading treatment or punishment" in violation of article VII of the covenant, and because of errors briefed in this appeal, the death penalty in this case constitutes the arbitrary deprivation of life in violation of article VI, section 1 of the covenant.

This issue was presented to this Court and specifically overruled in *State v. Smith*, 352 N.C. 531, 566, 532 S.E.2d 773, 795 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001). Defendant has presented no new arguments or any compelling reason for this Court to reconsider the issue in the present case. Therefore, this assignment of error is overruled.

[51] In defendant's next question presented before this Court, he contends that the trial court erred in determining that his prior record level was VI rather than V and that the trial court therefore erred in sentencing him for his noncapital felony convictions. The trial court added a point to defendant's prior record level as authorized under N.C.G.S. § 15A-1340.14(b)(6), which provides: "If all the elements of the present offense are included in the prior offense, 1 point." N.C.G.S. § 15A-1340.14(b)(6) (Supp. 1996) (amended 1997). The additional point that the trial court added pursuant to this section gave defendant a total of nineteen points, causing defendant to be placed in the highest prior record level, level VI. *See* N.C.G.S. § 15A-1340.14(c). Without this extra point, defendant would have been sentenced according to prior record level V. *Id.*

The State concedes that "[t]he error in adding a point under N.C.G.S. § 15A-1340.14(b)(6) arises because the only relevant prior offenses for the purposes of that subdivision were defendant's convictions in Georgia in 1977 for attempted rape and aggravated assault. The State cannot establish that all the elements of the present offenses are included in these two prior offenses." Thus, the State concedes this issue in that the trial court erred by adding a point to

**STATE v. WILLIAMS**

[355 N.C. 501 (2002)]

defendant's prior record level and that the extra point resulted in longer sentences for the noncapital felony offenses.

However, the State does not concede this issue as it relates to defendant's conviction against Jacqueline Crump for assault with a deadly weapon with intent to kill inflicting serious injury. The State argues that the trial court imposed the longest minimum sentence in the presumptive range allowed by N.C.G.S. § 15A-1340.17(c) for each felony conviction, under the theory that defendant's prior record level was VI. If the trial court had considered defendant's prior record level to be V, then the court could not have imposed minimum sentences of such duration. However, the State continues by stating that in the Crump assault, the trial court broke away from this practice and sentenced defendant to a minimum of 145 months, although the highest minimum term for this class C felony at prior record level VI is 168 months. Under the State's theory, 145 months falls within the range for minimum presumptive sentences for class C felonies at a prior record level V, and therefore, the trial court may have been somewhat lenient in the Crump assault case. Thus, the State contends that defendant has not suffered any harm in the sentence for the Crump assault from the trial court's error finding defendant to have a prior record level of VI. We disagree.

Defendant was sentenced at an incorrect prior record level, and the trial court sentenced defendant according to this incorrect prior record level. We are not persuaded by the State's contention that defendant was not harmed because the trial court could have sentenced defendant to lesser time for the Crump assault if the proper prior record level had been calculated. If the trial court was lenient with regard to sentencing defendant in the Crump assault case, as the State contends, then that is for the trial court to determine, not the State. Therefore, we remand this case for resentencing on only the noncapital felony convictions at a prior record level V.

## PRESERVATION ISSUES

Defendant raises nine additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred in denying defendant's motion to strike the death penalty on the ground that it is unconstitutional, and the court committed plain error by imposing a sentence of death that was arbitrary and conflicted with the constitutional requirement of individualized sentencing; (2) the trial court erred in its denial of defendant's

motion to restrict death-qualification of the jury; (3) the trial court erred in its denial of defendant's motion to bifurcate the jury; (4) the trial court erred by instructing the sentencing jury that a unanimous verdict was required for defendant to receive a sentence of life imprisonment; (5) the trial court erred by using the term "may" in its instructions in sentencing Issue Three; (6) the trial court erred by instructing the jurors that they had a duty to recommend a sentence of death if they unanimously answered "yes" to Issue Four; (7) the (e)(9) aggravating circumstance that a murder is "especially heinous, atrocious, or cruel" is unconstitutionally vague and arbitrary; (8) the trial court erred by denying defendant's pretrial motion for individual jury *voir dire*; (9) the trial court erred by granting the State's motion to limit defendant's questions on *voir dire*.

Defendant raises these issues in order to urge this Court to re-examine its prior holdings with regard to these issues. We have considered defendant's arguments on these issues, and we find no compelling reason to reverse our prior holdings. Therefore, the assignments of error presented under this issue are overruled.

## PROPORTIONALITY REVIEW

[52] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now determine: (1) whether the record supports the aggravating circumstances found by the jury and upon which the sentences of death were based; (2) whether the death sentences were entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentences are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See* N.C.G.S. § 15A-2000(d)(2) (2001).

In the instant case, defendant was convicted of two counts of first-degree murder. Each conviction was based both on premeditation and deliberation and under the felony murder rule.

Following the capital sentencing proceeding as to the Elliot murder, the jury found the following submitted aggravating circumstances: defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); the murder was committed by defendant while defendant was engaged in an attempt to commit first-degree rape, N.C.G.S. § 15A-2000(e)(5); the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and the murder was part of

a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

Also, as to the Elliot murder, the jury found two statutory mitigating circumstances: that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). Two additional statutory mitigating circumstances were submitted to but not found by the jury: defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1), and the catchall statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). Of the twenty-five nonstatutory mitigating circumstances submitted, the jury found that seventeen had mitigating value.

As to the Ashe murder, the jury found the following submitted aggravating circumstances: defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); the murder was committed by defendant while defendant was engaged in the commission of first-degree rape, N.C.G.S. § 15A-2000(e)(5); and the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The jury did not find the (e)(9) aggravator in this case, that the murder was especially heinous, atrocious, or cruel.

Also, as to the Ashe murder, the jury found two statutory mitigating circumstances: that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). Two additional statutory mitigating circumstances were submitted to but not found by the jury: defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1), and the catchall statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). Of the twenty-four nonstatutory mitigating circumstances submitted, the jury found that sixteen had mitigating value.

STATE v. WILLIAMS

[355 N.C. 501 (2002)]

After thoroughly reviewing the record, transcripts, and briefs in this case, we conclude that the evidence fully supports as to each murder the aggravating circumstances found by the jury. Further, we conclude that nothing in the record suggests that defendant's death sentences in this case were imposed under the influence of passion, prejudice, or any other arbitrary factor. We must now turn to our final statutory duty of proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *accord* N.C.G.S. § 15A-2000(d)(2). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has determined that the sentence of death was disproportionate in seven cases. *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *Young*, 312 N.C. 669, 325 S.E.2d 181; *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *Bondurant*, 309 N.C. 674, 309 S.E.2d 170; *Jackson*, 309 N.C. 26, 305 S.E.2d 703.

However, we find the present case distinguishable from each of these seven cases. In three of those cases, *Benson*, *Stokes*, and *Jackson*, the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. In the instant case, defendant was also convicted on the theory of premeditation and deliberation as to each murder. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and

**STATE v. WILLIAMS**

[355 N.C. 501 (2002)]

calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Additionally, this Court has never found a sentence of death to be disproportionate in a case where the jury found a defendant guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995).

Finally, as previously stated, in each murder, the jury found the following aggravating circumstances: (1) defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) in the Ashe case, the murder was committed while defendant was engaged in the commission of first-degree rape, and in the Elliot case the murder was committed while defendant was engaged in attempted first-degree rape, N.C.G.S. § 15A-2000(e)(5); and (3) the murder was part of a course of conduct in which defendant engaged and that course of conduct included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The jury also found as to one of the victims the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). "There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death." *Wallace*, 351 N.C. at 535, 528 S.E.2d at 360 (citing *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995)). The N.C.G.S. § 15A-2000(e)(3), (e)(5), (e)(9), and (e)(11) statutory aggravating circumstances which the jury found in these two murders ((e)(9) was found only in the Elliot murder) are among those four aggravating circumstances. *See id.*

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. In addition, while it is important for this Court to review all the cases in the pool when engaging in our duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It is sufficient to state that we have concluded that the instant case is more similar to cases in which we have found the death penalty proportionate than to those in which we have found the sentence of death disproportionate.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentences of death were either excessive or disproportionate. After a thorough and careful

review of the record, transcripts, briefs, and oral arguments, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Therefore, the convictions and sentences of death entered against defendant must be and are left undisturbed. We further conclude that defendant's trial on the noncapital charges was free from prejudicial error, but we remand those cases for resentencing as discussed previously herein.

NO. 97CRS8388, NO. 97CRS17582, FIRST-DEGREE MURDER: NO ERROR.

NO. 97CRS17583, NO. 97CRS17584, FIRST-DEGREE RAPE: REMANDED FOR RESENTENCING.

NO. 97CRS17587, FIRST-DEGREE SEXUAL OFFENSE: REMANDED FOR RESENTENCING.

NO. 97CRS17588, ASSAULT WITH A DEADLY WEAPON: REMANDED FOR RESENTENCING.

NO. 97CRS17590, NO. 97CRS17591, ASSAULT WITH A DEADLY WEAPON WITH INTENT TO KILL INFLICTING SERIOUS INJURY: REMANDED FOR RESENTENCING.

NO. 97CRS8000, ATTEMPTED FIRST-DEGREE RAPE: REMANDED FOR RESENTENCING.

NO. 97CRS8001, ASSAULT WITH A DEADLY WEAPON WITH INTENT TO KILL: REMANDED FOR RESENTENCING.